218 F.2d 341
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
R. H. OSBRINK, M. E. Osbrink and Berton W. Beals, as
Trustee, co-partners, doing business under the
firm name and style of R. H. Osbrink
Manufacturing Company, Respondents.
 No. 14073.
 United States Court of Appeals, Ninth Circuit.
 Dec. 20, 1954.
Rehearing Denied Feb. 23, 1955.
 
 George J. Bott, General Counsel, David P. Findling, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Washington, D.C., George O'Brien, Los Angeles, Cal., Arnold Ordman, Margaret M. Farmer, Attorneys, N.L.R.B., Washington, D.C., for petitioner.
 Gibson, Dunn & Crutcher, William F. Spalding, Frank M. Benedict, Nutter & Berger, Los Angeles, Cal., for respondents.
 Before STEPHENS and FEE, Circuit Judges, and LING, District Judge.
 STEPHENS, Circuit Judge.
 
 
 1
 The National Labor Relations Board is before us petitioning for an order of enforcement in two separate though related proceedings which were consolidated for hearing before an examiner, and later before the board. One was a proceeding to set aside a representative election and the other was upon charges that respondent had discharged certain employees in violation of § 8(a) (3) and (1) of the National Labor Relations Act, Title 29 U.S.C.A. § 158, and in violation of § 8(a)(1) as to certain rights guaranteed by § 7 of the Act, 29 U.S.C.A. § 157.
 
 
 2
 The examiner found in the affirmative as to the allegations of the complaint and reported to the board in favor of invalidating the election because of management interference and in favor of reinstating two discharged employees upon the finding that they had been discharged without cause and for their union activities, and ordered the posting of notices in relation to the violations of employees' rights as guaranteed by § 7 of the Act.
 
 
 3
 The board approved the report and made its orders accordingly.
 
 
 4
 At the outset it is well to dispose of one issue raised by Respondent. The union involved in the proceedings is the United Automobile, Aircraft and Agricultural Implement Workers of America, CIO (U.A.W.-C.I.O.) Region 6. Respondent makes the argument that 'Region 6' is the union and charges that 'Region 6' has not complied with § 9(f)(g) and (h) of the Act,29 U.S.C.A. § 159(f, g, h) (the anti-communist provisions). There is no such contention as to the U.A.W.-C.I.O. We reject the contention since the union involved is properly identified by its chosen name and it is apparent that 'Region 6' denotes a regional part of the whole.
 
 
 5
 It appears that the Osbrink manufacturing business has been successfully conducted for some time without union organization of its employees, and that when there was activity toward unionization, the management was displeased. The upshot of the matter was that on January 2, 1952, the board called an election for January 25, 1952, at which election the proposition to authorize the union, heretofore named, as employees' representative, was defeated by a vote of 196 against, to 100 for. The campaign right up to the voting was spirited with the union adherents on the one side and management-respondent on the other.
 
 
 6
 Ten days before the election date, John LeFlore, Jr., an active, outspoken pro-union employee, was handed his pay check by Wally Watkins with the statement that he was discharged. There is evidence that LeFlore asked Watkins (found by the Examiner and the Board to be assistant to foundry superintendent James Frederick Rasp) why he was fired and that he was told that the orders came from Rasp who admittedly was foundry superintendent. Rasp was not available, so LeFlore made the inquiry of R. H. Osbrink, one of the active partners, and the latter denied knowledge of the firing and referred him to Berton W. Beals, general manager of the plant. Beals denied knowledge but two days later he told LeFlore the discharge was because 'he got sand in the molds, because they could not keep track of him on his job, and because his work was unsatisfactory.' A member of LeFlore's crew asked Derry Smith (found by the Examiner and the Board to be a member of management) the reason for the discharge and Smith replied that he didn't know, that he was a good worker and he would try to get him back. The next day Smith said he wouldn't try to get LeFlore back because the latter had been passing out union hand bills. Later he told LeFlore he was sorry, that he had done all he could do but that he would never be taken back since it was known that he passed out union hand bills. Ralph Edward Goynes, another member of LeFlore's crew, testified that Watkins told him (Goynes) about a week after the discharge that LeFlore was discharged for talking about the union. There was contradiction of practically all of this testimony and respondent claimed LeFlore was careless and was wandering around, and an employee testified LeFlore was away about half the time and three or four times a day a substitute would have to be made. LeFlore testified that he was continuously being sent to various parts of the plant for supplies and denied leaving his post without authorization. There was more, pro and con. The examiner and the board found the fact to be that LeFlore was discharged illegally because of his union activity and we do not conclude that we should reverse the finding upon an over-all view of the testimony.
 
 
 7
 Archie Plummer had come into the plant as an employee in June, 1951, and he was a pro-union man and he discussed the unionization and advocated it in the plant with its anti-union employees. On January 20, 1952, Plummer sustained a back sprain and didn't report for work until February 13, 1952. On February 25, 1952, he requested and was granted by Uries Stephen Walker, his leadman (Walker should be distinguished from Watkins), absence for a day because of a cold. Plummer returned the next day and Watkins asked why he was absent, and Plummer explained that he had been granted permission. At the and of the work day Watkins gave Plummer his check and told him he was discharged for being off the job without reporting the absence. The discharge notice stated the discharge was because of 'absenteeism and tardiness'. Osbrink denied that employees were discharged for absenteeism and tardiness alone, but they were taken into account with other factors in evaluating an employee's work. There is evidence that respondent's records showed repeated absences of other employees without authorization. There is evidence also that Plummer was noticed by Rasp, plant superintendent, as a union observer during the counting of the election ballots. Plummer continued to talk unionization after returning. Respondent introduced evidence of Plummer's unsatisfactory work.
 
 
 8
 We are of the opinion that any reasonable over-all view of this evidence may well indicate that the pro-union activity was the motivating reason for the discharge, notwithstanding the testimony as to Plummer's unsatisfactory work. However, the examiner heard the witnesses and we see no good reason for disturbing his findings. We quote from petitioner's brief in note 2.[1]
 
 
 9
 We have briefly recited the evidence received by the examiner and the board, including the testimony which was received under the ruling that Derry Smith and Wally Watkins were supervisory employees. Respondent has all along contended that neither Smith nor Watkins had such status. We have read and studied the record from page one. the beginning, to page 502, the end, and we are of the opinion that if ever the doctrine of the Universal Camera case should be applied it should be applied upon this point it this case. Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. Every bit of testimony in the case relevant to the point indicates that Mr. R. H. Osbrink's statement that Wally Watkins was no more than Rasp's 'leg man', was accurate. There is no evidence that he was authorized or ever attempted to exercise any judgment as to policy or to hire or fire, demote or promote any employee. He was a trusted employee with intelligence enough to gather information for the management's action. He was a leadman. Derry Smith was a trusted and experienced employee who acted in the capacity of leadman and one of his duties was the breaking in of new workmen. There is no substantial evidence that he was authorized or ever attempted to speak or act for the management on any subject other than the actual conduct of the work. Both Watkins and Smith, as was said as to employees in N.L.R.B. v. Arma Corporation, 2 Cir., 1941, 122 F.2d 153, were 'key men' or 'straw bosses' but not supervisory personnel. One fact that stands out as to our conclusion that Smith was not, is that Smith voted at the election, without protest which, of course, is inconsistent with the claim that he was of management. N.L.R.B. v. Scullin Steel Co., 8 Cir., 1947, 161 F.2d 143. However, entirely apart from the managerial question, the evidence as to the heat engendered by the campaign up to the discharge of LeFlore, taken into consideration with the circumstances as to respondents' explanations of the discharges, justified the board's finding that they were motivated by the employees' union activities.
 
 The Election
 
 10
 What we have heretofore said indicates a heated atmosphere around the plant between the call for the election, January 2, 1952, and the election, January 25, 1952. In the language of the street, 'no punches were pulled'. As heretofore stated, John LeFlore, Jr., an active, perhaps the most active proponent of the union among all the employees, was discharged ten days before election for union activities. A week before the election, Derry Smith (found by the board to be a supervisory employee; we find otherwise) called a shake-down crew from work and told them that respondent, Mr. R. H. Osbrink, had told him that the plant would be closed if the union won the election. Smith warned Goynes, an employee under him, that Osbrink would take away certain presently enjoyed privileges if the union won. After LeFlore's discharge, Smith and Wally Watkins told employees that LeFlore had been let out because of union activity. The day before the election, Mr. Osbrink assembled and spoke to the employees about the election in which he made statements to the effect that he would match dollar for dollar the employees' contribution for a general welfare fund. He added, after his attorney had instructed him to do so, that his offer held whether the union won or lost. The situation was one in which fear of reprisal from management might well have prevented a free choice at the election.
 
 
 11
 The election was held in the afternoon and the employees were released before quitting time. Busses were furnished by management to take the men to the polls. It was pay-day but the men were not paid as they left work, as was the custom. It is in evidence that the men got their checks later, and there is no evidence that any discrimination was made as between those who voted or those who refrained. The examiner and the board regarded this instance as evidence of interfering with the election. We note with approval that counsel in his brief pays no attention to this incident. Respondent deserves commendation rather than adverse criticism for facilitating the voting.
 
 
 12
 Viewing the situation as a whole, however, and without consideration of expressions attributed to management through the board's finding that Smith and Watkins were supervisory employees, we think there is evidence sufficient to support the board's basis for its order invalidating the election, towit: the offer of inducements to vote against unionization, discharge of LeFlore for union activity.
 
 
 13
 We have alluded to Mr. Osbrink's speech to the employees the night before election. Respondent contends that there is nothing in it which is illegal and, anyway, it was error for the examiner to refuse respondent's offer of the whole speech in the record. We think the whole speech should have been received, but the part as to promise of matching dollar for dollar for a welfare fund, connected with the speech which was anti-union on the eve of the election, constituted in itself an interference with the employees' right to organize.
 
 
 14
 It will be recalled that the board in its complaint, in addition to the formal charges presented to the board, charged respondent with having violated § 8(a)(1) of the Act. That is, upon the evidence as to the discharges and as to the election, the respondent had 'interfered with' etc. the employees' rights as provided in § 7 of the Act. If this additional charge was properly in the complaint as an issue, it is quite apparent that the evidence sustains the charge. Whether it was properly in the complaint depends in large measure as to the proper significance of § 10(b) of the Act, 29 U.S.C.A. § 160(b).
 
 
 15
 The first part of this section, § 10(b), authorizes the issuance of a complaint in certain instances, then it is
 
 
 16
 'Provided, That no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge * * *.'
 
 
 17
 The formal charges which start the investigatory powers of the board in motion toward the issuance of a complaint, if the board deems such action advisable, were limited to the discharge of and discrimination against employees in violation of § 8(a)(1) and (3) of the Act. After its investigation the board issued its complaint in which the respondent was alleged to have violated the Act as the charges indicated but added an allegation accusing respondent of having violated § 8(a)(1) by interfering with, restraining and coercing its employees in the exercise of their rights guaranteed in § 7 of the Act, in the following particulars:
 
 
 18
 '(a) Questioning employees with respect to union membership and activities.
 
 
 19
 '(b) Threatening to close down the plant in the event of the Union's election as bargaining representative of the employees.
 
 
 20
 '(c) Threatening to discharge employees because of their Union activities.
 
 
 21
 '(d) Discharging employees because of their Union activities.
 
 
 22
 '(e) Threatening the employees with loss of benefits in the event the Union successfully organized the employes of Respondent's plant.
 
 
 23
 '(f) Offering benefits and rewards to the employees if they would withhold their support from the Union.
 
 
 24
 '(g) Undermining the Union in the eyes of the employees.'
 
 
 25
 And it is alleged these violations began about November, 1951, and continued up to date of the complaint. The charges, as amended the second time, were date March 4, 1952. The complaint was filed July 25, 1952, and it is not contended that any of the acts allegedly constituting violations of the Act occurred within six months of the latter date.
 
 
 26
 Therefore, respondent contends, it is clear that the six month limitation is applicable. On the other hand, all of the alleged acts were less than six months old when the charge was presented to the board. The board seeks to avoid the six month limitation by applying the 'relating back' theory. As was said in N.L.R.B. v. Gaynor News Co., 2 Cir., 1952, 197 F.2d 719, 721:
 
 
 27
 'This section § (10(b) of the Act, 29 U.S.C.A. § 160(b)) has been uniformly interpreted to authorize inclusion within the complaint of amended charges-- filed after the six months' limitation period-- which 'relate back' or 'define more precisely' the charges enumerated within the original and timely charge.'
 
 
 28
 And this court, in N.L.R.B. v. Globe Wireless, 9 Cir., 1951, 193 F.2d 748, 752, approved the relating back theory. The case was, in principle, the same as the instant one with the exception that the enlargement of the charge in the complaint was within six months of the acts complained of. In the instant case the acts were committed more than six months before the complaint was enlarged. It is true that the court intimated in its opinion in the Globe Wireless case that the relating back theory would not be applied in such a case. It is apparent, however, that the facts in that case brought the commission of the acts within the six months of the enlargement. It, of course, follows that the intimation was on a phase of point not before the court. The relating back theory was discussed in N.L.R.B. v. Vare, 3 Cir., 1953, 206 F.2d 543, 546, in circumstances different from the Globe Wireless case and the instant one as well, and the differences will be noticed in a short quotation from the Vare opinion:
 
 
 29
 'The 'amended' charges here are really new and different charges alleging new and different unfair labor practices against a new and different respondent.'
 
 
 30
 The new charges were dismissed. But the same court that decided the Vare case had the case of Cusano v. N.L.R.B., 3 Cir., 1951, 190 F.2d 898 before it. In Cusano, the amended the different charge related to practices antedating six months prior to the original charge and of course including the filing of the complaint. Yet it was held good on the relating back theory, since the amended charge rested upon the same acts as those in the original charge. The court's reasoning was not put beside the text of the section 10(b) of the Act, but was the result of reasoning generally that the charge could relate back because the employer would not be prejudiced since he would 'retain pertinent records, interrogate witnesses and, in a general way, prepare his defense' to the unfair labor practices complained of in the charge. (page 903.) The same is true in our case.
 
 
 31
 In N.L.R.B. v. Dinion Coil Co., 2 Cir., 1952, 201 F.2d 484, a complaint was filed including employees in addition to others who allegedly had been discriminately discharged. The original charge was made within the six months limitation but the enlarged charges by the complaint were without the limitation. The relating back theory was applied because all of the charges were closely related. See, also, to much the same effect N.L.R.B. v. Pecheur Lozenge Co., 2 Cir., 1953, 209 F.2d 393. See, also, N.L.R.B. v. Kobritz, 1 Cir., 1951, 193 F.2d 8. Much broader reasoning in applying the relating back theory will be found in Kansas Milling Co. v. N.L.R.B., 10 Cir., 1950, 185 F.2d 413, and in Cathey v. N.L.R.B., 5 Cir., 1951, 185 F.2d 1021, and Stokely Foods, Inc., v. N.L.R.B., 5 Cir., 1952, 193 F.2d 736; see also N.L.R.B. v. Bradley Washfountain Co., 7 Cir., 1951, 192 F.2d 144. We quote from National Licorice Co. v. N.L.R.B., 1940, 309 U.S. 350, 369, 60 S.Ct. 569, 579, 84 L.Ed. 799.
 
 
 32
 'It is unnecessary for us to consider now how far the statutory requirement of a charge as a condition precedent to a complaint excludes from the subsequent proceedings matters existing when the charge was filed, but not included in it. Whatever restrictions the requirements of a charge may be thought to place upon subsequent proceedings by the Board, we can find no warrant in the language or purposes of the Act for saying that it precludes the Board from dealing adequately with unfair labor practices which are related to those alleged in the charge and which grow out of them while the proceeding is pending before the Board. The violations alleged in the complaint and found by the Board were but a prolongation of the attempt to form the company union and to secure the contracts alleged in the charge. All are of the same class of violations as those set up in the charge and were continuations of them in pursuance of the same objects. The Board's jurisdiction having been invoked to deal with the first steps, it had authority to deal with those which followed as a consequence of those already taken. We think the Court below correctly held that 'the Board was within its powers in treating the whole sequence as one."
 
 
 33
 The limitation proviso was not in effect in that case, but the general subject of relating back is treated.
 
 
 34
 In our case at hand, the evidence, pro and con, relevant to violations of the labor Act and as well to the election contest, is relevant to the enlarged charge in the complaint. The enlarged charge must stand or fall upon the evidence as to the violations originally charged. In fact, the original charges and the charge enlarged by the allegation in the complaint relate to the same acts. In these circumstances, we think the relation back theory is applicable by its general application and operation of the proviso to § 10(b) of the Act.
 
 
 35
 We are of the opinion and hold that the allegations in paragraph 4 of the complaint are timely, and were proved.
 
 
 36
 Our order of enforcement will follow.
 
 
 
 [1]
 Brief of National Labor Relations Board, page 14: 'At the hearing respondents introduced evidence to prove that Plummer was lax and unsatisfactory in the discharge of his duties, and amended its complaint at the end of the hearing to allege this as an additional reason for his discharge. In this connection respondents called Mose Harris who testified that when Plummer worked with him as a relief man on the shake-out crew several months before the discharge, he sat around on a box instead of performing his duties. Walker testified that Plummer was absent on two or three occasions when it was time to pour and that he had warned Plummer that one of these days, he, Plummer, was going to lose his job.'