**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**HOTEL CONQUISTADOR, INC., d/b/a Hotel Tropicana, Respondent.**

No. 22330.

United States Court of Appeals
Ninth Circuit.

July 10, 1968.

Gary Green (argued), N.L.R.B., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Elliott Moore, Thomas Smith, Attys. N.L.R.B., Washington, D. C., Paul A. Cassady, Riector, N.L.R.B., Los Angeles, Cal., for appellant.

David Self (argued), Nathan R. Berke of Severson, Werson, Berke & Bull, San Francisco, Cal., Sidney R. Korshak, Chicago, Ill., Albert M. Dreyer, Las Vegas, Nev., for appellee.

Before: BARNES and CARTER, Circuit Judges, and SWEIGERT,* District Judge.

BARNES, Circuit Judge:

Pursuant to section 10(e) of the National Labor Relations Act, 29 U.S.C. § 160(e) (1964), the National Labor Relations Board has petitioned for enforcement of an order issued by the Board against Hotel Conquistador, Inc., doing business as the Hotel Tropicana. The decision and order of the Board, announced on June 24, 1966, are reported at 159 N.L.R.B. No. 105.

In its decision the Board found, in accord with the trial examiner, that the respondent

(a) discharged from its employ one Frank Yockmen because of his union activity, thereby violating sections 8(a) (1) and 8(a) (3) of the N.L.R.A., 29 U.S.C. § 158(a) (1), (3) (1964);

(b) interrogated Yockmen concerning his union activity, in violation of section 8(a) (1) of the Act; and

(c) gave Yockmen the impression, contrary to section 8(a) (1), that it was conducting surveillance of persons engaging in union activity.

Respondent claims that no charge was ever filed with the Board concerning the latter two issues, and that those issues therefore should not have been considered by the Board. In addition, and alternatively, respondent contends that none of the findings set out above is supported by substantial evidence.

Respondent operates the Hotel Tropicana, one of the large casino-hotels that dot the Las Vegas "Strip." Yockmen, the employee in question, was during the period here in question respondent's head slot machine mechanic. On April 7, 1964, Yockmen became a member of the American Federation of Casino and Gaming Employees, and subsequently became recording secretary of the union, and a member of its executive board. In May 1964 he took a key part in an organizational drive undertaken by the union at the Tropicana.

The direct evidence supporting the Board's findings of unfair labor practices may be briefly set out:

1. In June 1964 Harry Farnow, supervisor of respondent's slot machine department, entered the repair shop where Yockmen was working, and on the wall of which was posted a petition for representation that had been filed by the union. Yorkmen's entire testimony concerning the encounter is as follows:

"Q. Will you tell us what was said in the conversation?

"A. Well, he [Farnow] pointed to me the petition on the wall and he asked me if I knew anything about this.

"Q. And what did you say, if anything?

"A. I said, 'Yes' that I was a member and officer of the union.

"Q. Did he make any reply to this?

"A. No, none whatsoever. He walked out to the casino.

\* \* \* \* \* \*

"Q. \* \* \* [W]as there anything further that happened after this conversation?

"A. Well, Mr. Farnow had gone home and Phil Daly [an employee in the slot machine department] walked into the slot machine shop, oh, maybe an hour later, and I asked him if Mr. Farnow had said anything to him or if he was hot and Phil replied, 'No, he wasn't hot about anything.'

He was just a little disturbed that I didn't mention to him about this activity before the petition for election was held." R.T. 84–85.

2. On August 6, 1964, Yockmen was making his rounds in the Tropicana casino and stopped to talk to George Harvey, a supervisor of respondent's dealers. Their conversation as recalled by

---

* Hon. William T. Sweigert, United States District Judge, Northern District of California, sitting by designation.

Yockmen is fully set out in the following excerpt from the record:

"A. * * * I said, 'I hear there is a list in the pit'.

"Q. Can you tell us what list you are referring to?

"A. I was referring to a list of nominees.

"MR. RICHMAN [counsel for respondent]: Objection, Mr. Trial Examiner. That is a conclusion on the part of the witness. This is a state of mind—subjective state of mind that he may have had at the time of the conversation. The proper evidence would be what the conversation was between he and Harvey.

"TRIAL EXAMINER: The objection is overruled. The witness may answer.

* * * * * *

"A. Well, it was a list of nominees and officers of the American Federation of Casino and Gaming Employees.

"Q. Now, what did Harvey say in reply to your question?

"A. He says, 'Yeah,' and he says, 'and your name's on there with two stars behind them.'

* * * * * *

"Q. What, if anything, did you say to this?

"A. I said—well, I says that I feel pretty bad, and I asked him first, I says, who has the most stars behind their names and I didn't ask him who I meant—I asked what was the most stars behind the names and he said three, so I said that I feel pretty bad and I said I was elected to the executive board and I should have three stars myself, and he laughed and I walked away, went about my rounds.

"Q. Is that the end of the conversation?

"A. Yes." R.T. 87–89.

3. Sometime in August 1964 [1] Thomas Hanley, business manager for the union, requested that the Nevada Industrial Commission investigate an accident involving Yockmen at respondent's place of business. Shortly thereafter Yockmen was called to the office of respondent's paymistress, Lucretia Rozelle. Again we quote his testimony:

"Q. Can you tell us what was said?

"A. Well, she said what does Mr. Hanley have to do with this place.

"Q. What, if anything, did you say?

"A. I said why.

"Q. What did she say?

"A. She said that the Nevada Industrial Commission was coming down to take a report, and investigate my accident report there, the request of Mr. Hanley.

"Q. And what, if anything, did you say to that?

"A. I said—well, she said that they had been down here at 10:00 o'clock in the morning and that it was around 9:00 o'clock in the morning.

"Q. Was there any further conversation?

"A. No." R.T. 90–91.

4. On September 1, 1964, at Farnow's direction, Yockmen was dismissed from his position with respondent.[2]

1. Although the trial examiner describes the incident as having taken place "some two weeks before [Yockmen's] discharge," C.T. 51, the record is far from clear on this point. See R.T. 51, 90, 128–129. Resolution of the question, however, is not essential to any of our determinations herein.

2. Yockmen's notice of termination listed the ground for dismissal as "reduction in force." Respondent concedes that that justification for the dismissal was pretextual. It asserts, however,—and is not challenged in this respect by the Board —that it customarily utilized the quoted euphemism on termination notices, explaining the actual reason for discharge only upon request. Our view of its explanation in this case—that, as outlined below, Yockmen had become a financial "security risk"—is not affected by this practice.

## I. THE PROPRIETY OF THE INTERROGATION AND SURVEILLANCE ALLEGATIONS

█ The charge filed with the Board by the union on September 29, 1964, alleged only that Yockmen had been discharged for union activity, in violation of sections 8(a) (1) and (3) of the Act. The Board's complaint, however, which was issued on April 2, 1965, included also the allegation that Harvey's comments had given an impression that respondent was engaging in "surveillance" of the union activities of its employees, contrary to section 8(a) (1). And on the second day of the hearing before the trial examiner, the Board successfully moved for an amendment to the complaint, to include an allegation that Farnow, in his repair-shop conversation with Yockmen, had "interrogated" the latter concerning his union activity, contrary to section 8 (a) (1). Respondent's initial contention is that the latter two allegations were not properly before the trial examiner, since they were not included in the original charge.

In NLRB v. Osbrink, 218 F.2d 341 (9th Cir. 1954), cert. denied, 349 U.S. 928, 75 S.Ct. 770, 99 L.Ed. 1259 (1955), this court was faced with a similar argument. There we stated that section 10(b) of the Act [3]

" 'has been uniformly interpreted to authorize inclusion within the complaint of amended charges—filed after the six months' limitation period— which "relate back" or "define more precisely" the charges enumerated within the original and timely charge.' " 218 F.2d at 345, quoting NLRB v. Gaynor News Co., 197 F.2d 719, 721 (2d Cir. 1952).

In NLRB v. Dinion Coil Co., 201 F.2d 484, 491 (2d Cir. 1952), cited in our Osbrink opinion and recently reaffirmed as authority in Exber, Inc. v. NLRB, 390 F. 2d 127 (9th Cir. 1968), the rule for determining whether a complaint issued by the Board is properly supported by the charge is set out as follows:

"If a charge was filed and served within six months after the violations alleged in the charge, the complaint (or amended complaint), although filed after the six months, may allege violations not alleged in the charge if (a) they are closely related to the violations named in the charge, and (b) occurred within six months before the filing of the charge."

Here the additional allegations are sufficiently "closely related" to those contained in the original charge so that the "relation back" theory may properly be applied. Those allegations concern actions by respondent purportedly indicating its opposition to Yockmen's participation in the union, and presaging his allegedly improper dismissal. The Board's responsibility for vindicating the public interest would be unnecessarily restricted if it were strictly limited to the specific allegations contained in the charges filed with it. See Texas Indus. v. NLRB, 336 F.2d 128, 131–132 (5th Cir. 1964); NLRB v. Kohler Co., 220 F.2d 3, 6–8 (7th Cir. 1955).[4] Respondent does not con-

3. "Whenever it is charged that any person has engaged in or is engaging in any such unfair labor practice, the Board, or any agent or agency designated by the Board for such purposes, shall have power to issue and cause to be served upon such person a complaint stating the charges in that respect, and containing a notice of hearing before the Board or a member thereof, or before a designated agent or agency, at a place therein fixed, not less than five days after the serving of said complaint: *Provided*, That no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made, unless the person aggrieved thereby was prevented from filing such charge by reason of service in the armed forces, in which event the six-month period shall be computed from the day of his discharge. Any such complaint may be amended by the member, agent, or agency conducting the hearing or the Board in its discretion at any time prior to the issuance of an order based thereon. * * * "

4. The scope of the "relation back" theory must of course be confined within reason-

tend here that it was prejudiced in any way by the "relation back."

## II. THE "INTERROGATION" FINDING

■ The Board found that Farnow's question to Yockmen—the question whether Yockmen "knew anything about" the representation petition—constituted an impermissible "interrogation" of the latter concerning his union activities. We are unable to conclude that this finding is supported by substantial evidence.

■ The question just referred to constituted the whole of Farnow's part of the conversation; after Yockmen's reply, Farnow "walked out of the casino." There was no testimony that Farnow's demeanor was in any way threatening. We think the Second Circuit's opinion in Bourne v. NLRB, 332 F.2d 47, 48 (2d Cir.1964) (per curiam), provides helpful guidelines for dealing with the question of whether an impermissible "interrogation" has taken place. The factors to be considered, according to that opinion, include the following:

"(1) The background, i. e. is there a history of employer hostility and discrimination?

"(2) The nature of the information sought, e. g. did the interrogator appear to be seeking information on which to base taking action against individual employees?

"(3) The identity of the questioner, i. e. how high was he in the company hierarchy?

"(4) Place and method of interrogation, e. g. was employee called from work to the boss's office? Was there an atmosphere of 'unnatural formality'?

"(5) Truthfulness of the reply."

A weighing of these considerations here can only support our belief that the Board's finding lacks a substantial foundation in the record and cannot be sustained.

## III. THE "IMPRESSION OF SURVEILLANCE" FINDING

■ Harvey's comments to Yockmen concerning a "list" of union workers was found by the Board to have given the latter the impression that respondent was engaging in "surveillance" of the union activities of its employees. Although we think it a close matter, we conclude that this finding is supported by substantial evidence.

If such an impression was in fact given, it seems clear from past decisions that respondent has violated section 8(a) (1). E.g., NLRB v. Security Plating Co., 356 F.2d 725, 728 (9th Cir. 1966); Filler Prods., Inc. v. NLRB, 376 F.2d 369, 374–375 (4th Cir. 1967). And Harvey's comments may fairly be construed in the fashion in which the Board took them; the nature of the "list" referred to could have been inferred from the substance of his conversation with Yockmen. The fact that those comments came in response to a question does not seem materially to mitigate their undesirable effect. Nor does Yockmen's jocular response protect respondent—it may have been, and it is a permissible inference that he was putting up a false front of confidence and defiance, while nonetheless fearing the effect of the list; the Board could in fact reasonably have concluded that a report of such a list is inherently coercive, regardless of the

able limits. See, e. g., NLRB v. Kohler Co., supra, 220 F.2d at 7:

"There must be some relationship between charge and complaint * * *. Section 10(b) makes the filing of a complaint contingent upon the existence of a charge, and it has been consistently held that the Board cannot initiate a complaint on its own motion. N.L. R.B. v. National Licorice Co., 2 Cir., 104 F.2d 655, affirmed 309 U.S. 350,

60 S.Ct. 569, 84 L.Ed. 799. So long as the Board entered the controversy pursuant to a formal charge, it may allege whatever it finds to be a part of that controversy. But if it gets so completely outside of the situation which gave rise to the charge that it may be said to be initiating the proceeding on its own motion, then the complaint should fall as not supported by the charge."

strength of purpose of the employees to whom the report is made known.

## IV. THE UNLAWFUL DIS-CHARGE FINDING

 Determining the actual motive behind the dismissal of an employee is of course often an extremely difficult task, dependent principally upon circumstantial evidence and informed estimates concerning the springs of human conduct. The responsibility for making such determinations rests primarily with the Board, whose conclusions cannot be judicially overturned so long as they are supported by substantial evidence on the record viewed as a whole.

Here, respondent claimed that Yockmen was discharged because he had become a "security risk." In working on slot machines, Yockmen had access to coins which had not yet dropped into the machines' locked "drop boxes." He also had access to over $10,000 worth of tools and, on occasion, to the coins constituting a machine's "jack-pot." Some months before his dismissal, he had gone to respondent's paymistress and had requested advances on his salary; he explained that he had lost approximately $1000 gambling, and was unable as a consequence to pay his non-gambling debts. Despite a sign on her door stating, "Positively no advances in wages," the paymistress complied with his request. Yockmen continued to draw such advances (remaining, however, only a week or so ahead of his actual salary schedule) until the time of his dismissal. Phillip Daly, an employee in the slot machine department who in August 1964 assumed supervisory status, knew about the advances in June of that year. According to his testimony, however, he informed Farnow of the continued advances and the reason Yockmen found them necessary only on August 31. Farnow immediately ordered Yockmen dismissed.

While recognizing that respondent's position is not without foundation, we conclude that the Board's finding of an impermissible motive underlying Yock-

men's discharge is supported by substantial evidence. Harvey's comments of August 6, at least, may be taken as an indication of an anti-union attitude on the part of respondent. And the fact that Daly and Lucretia Rozelle knew about Yockmen's salary advances and their origin—and evidently did not regard them as cause for particular alarm —casts at least some doubt on the genuineness of Farnow's purported motive. Yockmen had, the trial examiner found, a good reputation for honesty and integrity among all those who knew him, including his associates at the Tropicana. This is not to say, of course, that respondent would not have been justified in discharging Yockmen as a "security risk." Indeed, a finding by the Board that that was in fact Farnow's motivation would have found substantial support in the record. We decide only that the Board's contrary finding is not without its own support.

The Board's order will be enforced insofar as it relates to the unlawful dismissal of Yockmen and to the impression given by respondent that it was engaging in surveillance of its employees' union activities. With respect to the allegedly unlawful interrogation of Yockmen, enforcement is denied.