**SANTA FE DRILLING COMPANY,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 22923.

United States Court of Appeals
Ninth Circuit.

Sept. 18, 1969.

James N. Adler (argued) & Roderick M. Hills, of Munger, Tolles, Hills &

Rickershauser, Los Angeles, Cal., for petitioner.

Ronald Wm. Egnor (argued), Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Nancy M. Sherman, Atty., Washington, D. C., for respondent.

Before CARTER and HUFSTEDLER, Circuit Judges, and BYRNE,* District Judge.

HUFSTEDLER, Circuit Judge:

Santa Fe Drilling Co. ("Santa Fe") petitions for a review of an order of the National Labor Relations Board ("the Board"), and the Board applies for an enforcement of the same order.

The order affirmed the decision of a Trial Examiner holding that Santa Fe had engaged in the following unfair labor practices during a union representation election held on an off-shore drilling platform near Kenai, Alaska: (1) coercive statements and threats to employees in violation of section 8(a) (1) of the National Labor Relations Act[1] ("the Act"), and (2) discriminatory discharges of employees in violation of section 8(a) (3) of the Act.[2] Santa Fe was ordered to cease and desist from coercing employees and from making discriminatory discharges. The Board further ordered Santa Fe to offer immediate and full reinstatement to five discharged employees and to make them whole for loss of pay.

Santa Fe contends that its agents did not coerce or threaten employees, that the discharges were for good cause and were not discriminatory, and that, in any case, reinstatement of three particular employees should not have been ordered. The Board contends that substantial evidence on the record as a whole supports the Board's findings that Santa Fe had coerced and discriminatorily discharged employees and that the remedies imposed were within the Board's discretion. We review the Board's findings seriatim.

The oil drilling platform in question is owned by the Shell Oil Company. Sante Fe performs the drilling operations on the platform under a labor contract with Shell. The platform began operation in March of 1965. Drilling operations are conducted on a 24-hour basis by three 7-man drilling crews, each working a 12-hour shift, 10 days on and 5 days off. Each crew is under the immediate supervision of a driller. The crews are supervised by foremen or pushers, two employed by Santa Fe, two by Shell. During the period herein in question, the pushers for Santa Fe were Vernon Blair and Coleman "Prim" Roady. Vernon "Bud" Furry of Shell was in charge of the overall operation of the platform.

On January 25, 1966, the Alaska Petroleum Crafts Council ("APCC") petitioned the Board for a representation election. The International Union of Petroleum Workers, AFL–CIO ("IUPW"), intervened. By consent of all the parties, an election was scheduled for February 20, 1966. The tally of ballots from the election showed 15 for IUPW, 2 for APCC, 14 for neither, and 5 were challenged.

1. *Section 8(a) (1) Violations*

The Trial Examiner found that certain statements made before and after the representation election by Santa Fe's

---

* Hon. William M. Byrne, Senior Judge, United States District Court for the Central District of California, sitting by designation.

1. Section 8(a) (1): "[It shall be an unfair labor practice for an employer] * * * to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 * * *."

Section 7: "Employees shall have the right to * * * join labor organizations, [and] to bargain collectively * * *."

2. Section 8(a) (3): "[It shall be an unfair labor practice for an employer] * * * by discrimination in regard to hire or tenure of employment * * * to encourage or discourage membership in any labor organization."

supervisors Blair and White violated section 8(a) (1) of the Act by restraining and coercing employees in the exercise of rights guaranteed by section 7.

### a. *Interrogation of Gordon*

■ The first violation, as found by the Trial Examiner, occurred in January 1966, when Blair called employee Gordon aside to talk about "this union deal." Blair had information that Gordon had been involved in strike violence occurring with another Alaskan drilling contractor. Blair questioned Gordon about this though he assured Gordon that he "didn't mind people that were in union activities, just as long as they did their work well." Gordon disclaimed interest in union activities. Blair mentioned existing company benefits and urged Gordon to vote in the election. The Trial Examiner found that this conduct was unlawful interrogation and violated section 8(a) (1).

■ The interrogation of employees concerning their union activities is not unlawful per se. Interrogation becomes unlawful under the Act only when it is expressly or implicitly threatening or coercive. A number of factors must be considered in determining whether such interrogation is coercive. (*See* N. L. R. B. v. Hotel Conquistador, Inc. (9th Cir. 1968) 398 F.2d 430, 434; N. L. R. B. v. Milco, Inc. (2d Cir. 1968) 388 F.2d 133; N. L. R. B. v. Consolidated Rendering Co. (2d Cir. 1967) 386 F.2d 699.) The Trial Examiner concluded that "Blair's statements to Gordon and his none too subtle interrogation were reasonably calculated by Blair and interpreted by Gordon as an attempt to ascertain the latter's union sentiments and to instill in him apprehension of the consequences of any renewed union activity." This conclusion is supported by substantial evidence in the record considered as a whole and suffices to indicate a violation of section 8(a) (1) by Santa Fe.

### b. *Threats to Carter, Sherwood, and Gardner*

■ The next violations found by the Trial Examiner consisted of threats by Blair that certain existing benefits would be withdrawn if the employees chose a union. Carter, Sherwood, and Gardner testified at the hearing that Blair expressly threatened that benefits would be withdrawn if the employees chose to unionize. Blair denied such threats, and a number of employees— including three who were found to have been discriminatorily discharged—acknowledged that no explicit threats were made by Blair. The Trial Examiner did not expressly resolve this conflict, but he found that whether or not explicit threats were made, Blair's repeated enumerations of existing benefits in head-to-head confrontations with employees constituted implicit threats of reprisal, because Blair thereby reasonably conveyed the impression that benefits might be withdrawn and employees compelled to work harder if they voted for a union.

■ Threats by an employer to withdraw existing benefits if employees unionize are not speech which is protected by section 8(c) of the Act. (N. L. R. B. v. TRW–Semiconductors, Inc. (9th Cir. 1967) 385 F.2d 753.) Such threats violate section 8(a) (1) of the Act. (N. L. R. B. v. Luisi Truck Lines (9th Cir. 1967) 384 F.2d 842, 845.) Whether language has a threatening or coercive effect upon employees depends upon the totality of the circumstances in which it is used. (N. L. R. B. v. Sinclair Co. (1st Cir. 1968) 397 F.2d 157, aff'd sub nom. N. L. R. B. v. Gissel Packing Co. (1969) 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547.) The Trial Examiner's finding, affirmed by the Board, that Blair's enumerations of benefits were implied threats of reprisal under the circumstances is supported by ample evidence. The Trial Examiner and the Board correctly concluded that the resolution of the conflict over the existence of express

threats was legally irrelevant to the issue whether section 8(a) (1) had been violated.

### c. Threats to Gardner, Barefield, Carter, and Bloodsworth

■ The next violations of section 8 (a) (1) found by the Trial Examiner occurred immediately after the election. Blair told employees Gardner and Barefield that he was not going to let the men run him off by dragging their feet and jeopardizing his record. According to Gardner and Barefield, Blair also stated that 17 men had voted for the union, and "I am going to run every one of you off—and you two [Gardner and Barefield] are going to be first." Carter and Bloodsworth testified to similar statements by Blair. Blair denied making these statements threatening discharges. But the Trial Examiner considered all the circumstances and credited Gardner's version and discredited Blair's version of Blair's remarks after the election. Threats of the kind attributed to Blair violated the Act. Santa Fe admits that the Trial Examiner's assessment of credibility cannot be overturned unless the finding contains clear error. (N. L. R. B. v. Luisi Truck Lines, *supra*.) We do not perceive any error.

The Trial Examiner and the Board also found a violation of section 8(a) (1) by driller Troy White. Employee Bloodsworth testified that White told the men that since they voted for the union, there would be no more coffee breaks, movies would be curtailed, and visits to the lavatory would be restricted. White denied making these statements, except for the statement about lavatory restrictions. The Trial Examiner did not believe White.

We conclude that substantial evidence on the record as a whole supports the Board's finding that Santa Fe, through its agents White and Blair, violated section 8(a) (1) by threatening to withdraw benefits should the employees choose a union and threatening to discharge employees who voted for the union.

### 2. Section 8(a) (3) Violations

The representation election was held on the platform on February 20, 1966. On February 22, employee Lloyd W. Collins was discharged; on February 24, employee Arthur W. Gordon was discharged; on March 20, 1966, employee Sidney R. Sherwood was "bumped" by a man with seniority and was not offered the opportunity to "bump" a man with a lower position and less seniority; on May 7, 1966, employee David L. Gardner was discharged; and on June 9, 1966, employee Ernest N. Barefield was discharged. The Board adopted the Trial Examiner's finding that all these discharges were discriminatory and in violation of section 8(a) (3) of the Act. Santa Fe contends that all the discharges were for good cause and were not motivated by an antiunion animus. The Trial Examiner found that the good causes offered for the discharges were mere pretexts for the antiunion motive.

■ The general principles governing our review of Board findings of discriminatory discharges have been adequately summarized elsewhere. (N. L. R. B. v. Miller Redwood Co. (9th Cir. 1969) 407 F.2d 1366; N. L. R. B. v. Hotel Conquistador, Inc., *supra*, 398 F.2d at 435; Aeronca Mfg. Co. v. N. L. R. B. (9th Cir. 1967) 385 F.2d 724; N. L. R. B. v. Security Plating Co. (9th Cir. 1966) 356 F.2d 725, 728.) Under section 8(a) (3), an employer is prohibited from discharging an employee because of the employee's union activities or sympathies. The determination which the Board must make is one of fact— what was the *actual motive* of the discharge? A tendered cause for the discharge will be rejected if it is found to be a mere pretext for the actual antiunion motive. The determination of actual motive is, of course, a difficult task; it depends principally upon inferences drawn from the entire web of circumstances presented by the evidence. Our review of the Board's finding of the

fact of motivation is limited to determining whether the evidence relied upon is credible and the inferences drawn are reasonable. (R. J. Lison Co. v. N. L. R. B. (9th Cir. 1967) 379 F.2d 814.)

With these principles in mind, we review seriatim the findings as to each discharged employee.

### a. *Lloyd Collins*

Collins was originally hired as a floor hand and was promoted to derrickman within a month. Blair and Olds, Collins' pusher, admitted that Collins was an "excellent worker" and that he had been recommended for a promotion to driller. Blair discharged Collins two days after the election. Blair gave two reasons for the discharge: (1) Collins' poor attitude, and (2) his negligence in allowing $1000 worth of drilling mud to spill.[3] The Trial Examiner rejected the reasons as pretexts and found that, in violation of section 8(a) (3), Collins had been discharged for his union activities.

■ Santa Fe contends that this finding is not supported by substantial evidence because there is no credible evidence in the record to establish that Blair knew about Collins' union activities, and the evidence indicates that the motive for discharging Collins was not his union activities.

There was evidence that Collins had expressed his dissatisfaction with wage conditions and his prounion sentiments to some of his fellow employees before the election, but there was no direct evidence that Collins or anyone else told Blair what Collins had said. But Blair's knowledge of Collins' union sympathies could have been and was inferred from Carter's testimony that Blair told him shortly after the election that Collins

was trying "to [get] him" and that Collins had voted for the union.[4]

■ Santa Fe cites a number of Collins' derelictions to support its claim that Collins was fired for good cause and not for his union activities. The citations read in a vacuum support Santa Fe. But the incidents have to be placed in the total setting in which they occurred to ascertain motivation. Collins did make abusive and obscene remarks to his superiors, yet there is no suggestion that Collins' colorful and contumacious form of expression first manifested itself around election time. Collins did cause a serious mud spillage, but there was evidence that mud spillages were not rare and no one, except Collins, who had caused one had ever been fired for it. Blair's pique about union activity, likewise expressed in earthy terms, was well established. From the totality of the evidence we cannot say that the Trial Examiner's finding that the real motive for discharging Collins was antiunion animus is not adequately supported by the record.

### b. *Arthur Gordon*

■ Gordon was employed as a floor hand until Blair fired him on February 24, 1966. The announced reason for the discharge was Blair's finding Gordon sleeping instead of performing his assigned task of pit watching. The Trial Examiner found that Gordon's dereliction was Blair's excuse for the discharge and that Blair's real motivation was antiunion animus.

The record shows that Blair knew about Gordon's union activity and that Blair did not like it, and that Blair personally disliked Gordon. Aside from the dozing incident, Gordon's work was sat-

---

3. A third reason for Collins' discharge was brought out at the hearing before the Trial Examiner, but Santa Fe has not relied upon it in seeking review in this court.

4. Santa Fe attempts to discount Carter's testimony, because Carter's memory had to be refreshed by his pretrial statement to the Board. However, the use of a writing to refresh a witness' recollection is a practice well recognized in the law of evidence. *See, e. g.,* California Evidence Code § 771(a).

isfactory. The record also shows that pit watching was an assignment requiring alertness and that neglect of the assignment could endanger safety of the platform. The record would have supported a finding, had one been made, that Gordon was fired for good cause and not for his union activity. But it does not follow that the Trial Examiner's finding to the contrary is unsupported. Blair's action in the light of his expressed hostility to Gordon and to Gordon's union activity supports the Trial Examiner's conclusion that the dozing incident was pretextual.

### c. Sidney Sherwood

 Sherwood was hired as a roustabout on December 7, 1965, and was promoted to derrickman on January 21, 1966. On March 20, 1966. Sherwood was "bumped" by a senior employee from another drilling rig. Blair refused to allow Sherwood, in turn, to bump roustabouts with less seniority because he said that Sherwood's performance as roustabout had been poor.

Blair admitted that he knew that Sherwood was a union supporter. The Trial Examiner considered the cause given for the refusal to allow Sherwood to bump a junior employee to be pretextual. He found that Blair's charge of poor performance was belied by Sherwood's prompt promotion from roustabout to a higher rated, better paying, and more desirable job. Santa Fe contends that the promotion was engineered without Blair's knowledge and in his absence. The Trial Examiner's inference of antiunion animus was a reasonable one. Blair had threatened to run off every crewman who voted for the unions. His refusal to allow Sherwood to bump a junior employee can be considered a threat made good, considering the flimsy substantiation for the poor performance charge.

### d. David Gardner

Gardner was hired on March 25, 1965, and served in a number of positions un-

til his discharge in May 1966. He was an active union supporter and served as an observer for the IUPW in the election. He had a quarrel with supervisor Roady concerning the docking of his wages on election day. Gardner was also one of two employees whom Blair specifically threatened to discharge four days after the election.

During the first week in May, Shell's pusher, Furry, decided to work a crane crew at night. Blair decided to use crane operator Carter and his two roustabouts, Gardner and Honeysett, although that crew was ashore on their five days off. Blair notified Carter that his crew was to report 12 hours early at 6 p. m. on May 7 instead of 6 a. m. on May 8. Carter told Gardner of the change. Thereafter Carter notified the platform that he was too ill to report on the 7th. Gardner went to the platform on the afternoon of the 7th, but found neither Carter nor Honeysett. The helicopter pilot told him that Carter's crew was not going to the platform until the next day. Gardner concluded that there was no need for him to report since his crew was not going out. The following afternoon, Gardner was flown to the platform and promptly discharged.

The Trial Examiner found that the discharge was discriminatory, relying upon the fact that Blair had specifically threatened to run Gardner off for his prounion sympathies. Santa Fe contends that the decision to discharge Gardner was made by Shell's supervisor Furry and not by Blair. That being so, Santa Fe contends that Furry must be shown to have known of Gardner's union activities and to have ordered the discharge on that account. Santa Fe contends that no such showing was ever made.

 We disagree. There is some indication that the Trial Examiner did not consider it necessary to find that Furry entertained an antiunion animus when he ordered Gardner's discharge. Assuming that Furry was entirely responsible for the decision, this legal position is

erroneous. (*See* Salinas Valley Broadcasting Corp. v. N. L. R. B. (9th Cir. 1964) 334 F.2d 604, 613; N. L. R. B. v. Whitfield Pickle Co. (5th Cir. 1967) 374 F.2d 576, 581.) The Trial Examiner also found that Blair, who admittedly knew of Gardner's union activities and who was found to have threatened to discharge Gardner because of such activities, contributed to the accomplishment of the discharge. Such a connection is sufficient to support the Trial Examiner's inference that Gardner was discharged because of his union activities. (N. L. R. B. v. Neuhoff Bros. Packers, Inc. (5th Cir. 1967) 375 F.2d 372, 374.)

Alternatively, Santa Fe contends that Gardner was fired for good cause—because he violated a company rule that requires an employee to notify the platform in advance if he cannot report for his tour or have good cause for failing to do so. The evidence as to how strictly this rule was enforced against first offenders was conflicting. The Trial Examiner found that, under the circumstances, Gardner had been accorded disparate treatment. That finding and the ultimate finding that Gardner had been discriminatorily discharged are supported by substantial evidence on the record as a whole.

#### e. *Ernest Barefield*

Barefield was employed as a pit watcher in December 1965. The essential facts concerning the discharge are not in dispute. On June 9, 1966, the power was shut down on the platform. Driller Olds told his crew to do as much painting and scraping as possible. Supervisors Roady and Olds found Barefield in the mud loggers shack reading a magazine. Roady fired Barefield on the spot.

The Trial Examiner found that Barefield's conduct could have furnished ample cause for discharge, but he found the discharge was discriminatory because Santa Fe's supervisors seized the earliest opportunity to rid the company of a known union adherent. Barefield had

told Blair that he was a union member, and Blair had specifically singled out Barefield as one of the employees he was going to run off.

Santa Fe contends that there is no evidence in the record indicating that Roady knew or suspected Barefield of union activity and that the Trial Examiner made no finding that Roady did so know or suspect. We agree that no finding of knowledge on the part of Roady was made. As we noted above, unless it is found that some person who participated in or contributed to the discharge knew or suspected that the employee had engaged in protected union activity, an ultimate finding of discriminatory discharge cannot be upheld. (N. L.R.B. v. Neuhoff Bros. Packers, Inc., *supra*; Salinas Valley Broadcasting Corp. v. N.L.R.B., supra, 334 F.2d at 613; Federation of Union Representatives v. N.L.R.B. (2d Cir. 1964) 339 F.2d 126.)

Counsel for the Board contends that the record provides ample evidence from which an inference of knowledge on the part of Roady could be drawn. We do not pass on the question as to whether or not in a situation where neither the Examiner nor the Board drew the inference, this court may draw the inference of knowledge on the part of Roady of the union activities of Barefield. (*See* N.L.R.B. v. Ambox, Inc. (5th Cir. 1966) 357 F.2d 138, 142; N.L.R.B. v. Transport Clearings, Inc. (5th Cir. 1962) 311 F.2d 519; N.L.R.B. v. Roberto Alvaro Mfg., Inc. (1st Cir. 1964) 327 F.2d 998.) We think under the facts of this case that whether the inference should be drawn or not is a matter for the Board. (*Cf.* N. L.R.B. v. Metropolitan Life Ins. Co. (1965) 380 U.S. 438, 444, 85 S.Ct. 1061, 13 L.Ed.2d 951.)

#### 3. *Reinstatement Orders*

We have held that substantial evidence supports the Board's findings that employees Collins, Gordon, Sherwood, and Gardner were discharged because of their union sympathies. Santa Fe contends

that the remedy of reinstatement with back pay ought not to have been ordered as to each employee.

■ The Trial Examiner found that Sherwood used threatening, abusive, and obscene language toward Blair, when Blair told him that he had been laid off. The Trial Examiner concluded for this reason that Sherwood had forfeited his right to reinstatement and back pay and recommended that neither remedy be ordered with respect to Sherwood. The Board declined to follow the recommendation. The Board held that Sherwood's sense of indignation at being laid off had considerable justification. It noted that no actual threats of physical harm or bodily violence were made and that the obscenity used was not a serious breach of decorum on an off-shore drilling platform. In conclusion, the Board found that Sherwood's remarks were not such aggravated and gross misconduct as to render Sherwood unfit for further employment.

We have recently had occasion to note that postdischarge misconduct which will justify a court in refusing to enforce a Board order to rehire depends upon the degree and kind of misconduct. (N.L.R.B. v. Miller Redwood Co., *supra*, 407 F.2d at 1370 n. 2).) Each case must be decided on its own facts. We agree with the Board that the remarks by Sherwood were not so flagrant as to justify the withholding of the normal remedy of reinstatement. (*Compare* N.L.R.B. v. M & B Headwear Co. (4th Cir. 1965) 349 F.2d 170; N.L.R.B. v. Morrison Cafeteria Co. (8th Cir. 1963) 311 F.2d 534, 538, with N.L.R.B. v. R. C. Can Co. (5th Cir. 1965) 340 F.2d 433.)

■ Gardner testified that he had intended to quit his job the morning after he was discharged without regard to the discrimination against him and that he had obtained, or was about to obtain, another job at which, in fact, he was still working at the time of the hearing. On the basis of this testimony, the Trial Examiner recommended that Santa Fe be ordered to make Gardner whole for any loss of earnings caused by Santa Fe's discrimination, but recommended that no offer of reinstatement be made. The Board disagreed with the Trial Examiner. The Board reasoned that the numerous instances of interference, restraint, and coercion committed by Santa Fe in violation of section 8(a)(1) of the Act would reasonably cause an employee to be insecure and to think in terms of other employment. The Board therefore found that Gardner's decision to terminate his employment voluntarily was not a rational, uncoerced decision which can be construed as a waiver of his right of reinstatement.

Santa Fe contends that the Board erred in failing to follow its own decision in Tomahawk Boat Mfg. Corp. (1963) 144 N.L.R.B. 1344, 1345 n.2. Santa Fe reads *Tomahawk Boat* for the broad proposition that an employee is not entitled to back pay beyond the date he would have been working for the company if he had not been discriminatorily discharged. We do not read it so broadly. In *Tomahawk Boat,* the employer decided for lawful reasons to replace an employee as soon as a suitable replacement could be found. The employee was discriminatorily discharged a month later. The Board denied reinstatement. In the present case, it was the employee who sought other employment after his employer had engaged in unfair labor practices and threatened to discharge employees.

Under the circumstances of this case, we think the Board acted within its discretion in devising an appropriate remedy for unfair labor practices. There is substantial evidence to support its conclusion that Gardner's decision to seek other work was caused by Santa Fe's supervisors' threats to "run off" union adherents. Gardner was one of the two employees mentioned specifically by Blair in his postelection tirade. The situation is thus analogous to a constructive discharge. (*See* N.L.R.B. v. Tennessee

**734**

Packers, Inc. (6th Cir. 1964) 339 F.2d 203.) The Board's order is well within its broad powers to order reinstatement in order to effectuate the policies of the Act. (Phelps-Dodge Corp. v. N.L.R.B. (1941) 313 U.S. 177, 189–197, 61 S.Ct. 845, 85 L.Ed. 1271.)

■ Santa Fe argues that Collins should not be reinstated because he had been guilty of misconduct for which he would have been summarily discharged had his employer known about it before he was discriminatorily discharged. (Uniform Rental Service, Inc. (1966) 161 N.L.R.B. 187, 190; Fort Smith Broadcasting Co. (1964) 146 N.L.R.B. 759, 766–67, enforcement denied on other grounds (8th Cir. 1965) 341 F.2d 874.) Failure to apply this principle affecting reinstatement does not warrant refusal to enforce the Board's order unless that failure constituted an abuse of the Board's discretion. (N.L.R.B. v. Terry Coach Industries, Inc. (9th Cir. 1969) 411 F.2d 612.) Collins admitted that he brought liquor aboard the platform. He explained that he was unaware of the company rule against it. There is no evidence that Collins drank any of the liquor or gave anyone else liquor. Judging the credibility of Collins' testimony is without our purview. We cannot say that the Board under the aggravated circumstances of this case abused its discretion in ordering Collins' reinstatement.

■ The Board's order for the reinstatement of employees Collins, Gordon, Sherwood and Gardner is ordered enforced. The Board's order for the reinstatement of Barefield is denied and the case remanded to the Board for its determination as to whether or not it sees fit to draw the inference from the record that Roady knew of Barefield's union activities and his discharge was based upon such union activities. The Board is directed to prepare an order in conformity with the views herein expressed.