NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL AND ORNAMENTAL IRON WORKERS, LOCAL 433, Respondent.

No. 77–2653.

United States Court of Appeals,
Ninth Circuit.

July 16, 1979.

772

Alan Banov (argued), and E. H. Stillman, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., for petitioner.

Victor J. Van Bourg, David A. Rosefeld (argued), Van Bourg, Allen & Weinberg, San Francisco, Cal., for respondent.

Before WALLACE and TANG, Circuit Judges, and WHELAN *, District Judge.

* The Honorable Francis C. Whelan, Senior District Judge for the Central District of California, sitting by designation.

TANG, Circuit Judge:

The National Labor Relations Board petitions for enforcement of its order against the respondent International Association of Bridge, Structural and Ornamental Iron Workers, Local 433. The order directs that the Union cease and desist from operating its exclusive hiring hall in disregard of its collective bargaining agreement and from engaging in threats and acts of violence against employees who protest against the manner in which the hall is run. It also directs that the Union "make whole" those persons who were unlawfully refused dispatch. The Union, raising mostly procedural objections, argues against enforcement. We order enforcement.

After Waldo F. Kurstens, an individual, charged that the Union was engaging in unfair labor practices, the Board issued a complaint against the Union alleging that the hiring hall practices of the Union violated §§ 8(b)(1)(A) and 8(b)(2) of the National Labor Relations Act, 29 U.S.C. §§ 158(b)(1)(A) and 158(b)(2) (1970).[1] The complaint was heard before an administrative law judge (ALJ), whose findings of fact are virtually undisputed by the Union. We summarize these findings as follows.

The Union has collective bargaining agreements with a number of multi-employer associations and individual employers who hire ironworkers. The contract provides that the hiring of ironworkers who are employed by the contracting employers is to be done pursuant to § 5 of the contract.

Section 5 allows an employer to employ, without resort to the hiring hall, a minimum number of "key employees". Additionally, the employers may directly employ "regular" employees, i. e., employees who worked 50% of their working time during the past 12 months for the employer. All other employees must be hired through the union's exclusive hiring hall.

When the employer hires through the hall, it may do so in two ways. It may hire employees "by name"; in such cases, the named employees may be in the ratio of three for every five employees hired, without regard to their position on the registration lists. All other journeymen required by the employers are furnished by, and referred through, the hiring office of the Union on an "open order" basis.

The contract specifies an orderly procedure for referring employees who are requested on an open order basis. First, the contract defines five categories of applicants for employment, assigning the highest priority to workers with the most experience in the trade and in the area. Each worker seeking employment through the hall must sign the "out of work" list for his priority group. After he does so, the business agent who is in charge of the hall at the time gives the worker an out-of-work number. Every Monday there is a general roll call of the out-of-work list, and applicants on the list who answer the roll call are given new out-of-work numbers based on the number of dispatches made the previous week. As ironworkers with the lowest numbers are dispatched, applicants who appear at the hiring hall move down on the list and receive lower numbers. Thus, those on the out-of-work list who come to the hall and are unemployed the longest should have the lowest numbers while new applicants (such as those returning from jobs) should have the highest numbers.

When an employer who is bound by the contract needs ironworkers from the hiring hall, he notifies a Union agent of his needs and an order is placed for those workers. Sometimes the employer specifically states what types of skills are needed; at other times the agent knows from experience

1. Section 8(b)(1)(A), 29 U.S.C. § 158(b)(1)(A) makes it an unfair labor practice for a labor organization to restrain or coerce employees in the exercise of their rights guaranteed in § 7 of the Act. Under § 8(b)(2), 29 U.S.C. § 158(b)(2), it is an unfair labor practice for a labor organization to cause or attempt to cause an employer to discriminate against an employee in violation of § 8(a)(3), 29 U.S.C. § 158(a)(3). Section 8(a)(3) prohibits an employer from discouraging or encouraging union membership by discrimination in regard to hire, tenure, or terms and conditions of employment.

what skills are needed and makes a judgment about the skills to be required.

After receiving the order, the Union business agent in charge of the hall at the time calls out the order on a public address system in the hall. He specifies the name of the employer and the type of work that is to be done. The calls are made between 8 and 10:30 A.M. and the applicant must be in the hall when the call is made. Often there are as many as 300 applicants on the out-of-work list that are present in the hall when the calls are made. Anyone with an out-of-work number can bid on a job and the bidding worker with the lowest number receives the job.[2] The worker is then given a referral slip to the job signed by the business agent in charge and reports to work.

The ALJ found 76 specific instances during a ten month period in which the Union dispatched employees without adhering to the referral procedure. The term "backdooring" is used to describe the situation when the Union makes a job referral in a manner that bypasses the prescribed referral procedure.

In his findings, the ALJ elaborated on each instance of backdoor referrals. The backdooring fell into three categories. First, the Union dispatched individuals who were not eligible for dispatch because they were not on the out-of-work list. Second, the Union filled open orders by announcing calls "by name", thus preventing applicants on the out-of-work lists from bidding on these jobs. Third, the Union dispatched employees after receiving open orders without announcing the orders at the hall, thereby bypassing the entire referral procedure. In these situations, the Union gave employees referral slips at places outside the hiring hall.

The Union's business agents were quite open with regard to their practice of backdooring employees. On numerous occasions, some of them engaged in threats and violence to protect that practice.[3]

The ALJ found that the Union's circumvention of the referral procedure was not isolated or keyed to emergency situations. Instead, they were so "massive" in scale as to undermine the procedure and "substitute the business agents' clandestine desires for the objective criteria set forth in the contract."

The ALJ concluded:

Considering the statements and actions of Respondent's business agents, together with the 76 specific incidents of backdooring documented by the General Counsel, it is apparent that Respondent's business agents divided Respondent's jurisdiction into fiefdoms from which they dispensed patronage. Some of the business agents

2. For a number of reasons, an applicant with the lowest number may decide not to bid on a certain job. He may believe that he lacks the skills to do the particular job, that the job requires too much traveling, or that he wants a job of longer duration.

3. The Board summarized its findings with respects to threats and acts of violence as follows:

In early August 1974 Business Agent Ward acknowledged to Johnson that he (Ward) was backdooring employees when he said to Johnson, "you found out I was going to backdoor the job, didn't you?" On January 26, 1976 Ward told a number of employees, "In no way will I send anybody back to a job that's suing the Union." On September 25, 1975, Respondent's president and business agent, Rogers, violently assaulted Business Agent Kenney because Kenney had dispatched two men in Rogers' territory. Kenney was hospitalized with serious injuries. On December 11, 1974 Rogers replaced Cunningham with Morrison as steward on the Blount job because Cunningham refused to help Rogers in circumventing the hiring hall procedure. On February 13, 1975 when Zink questioned Business Agent Ward about a referral that Zink thought improper, Ward threatened to pound Zink's head in the pavement. On February 19, 1975 when Sims spoke about Respondent's backdooring of employees, Business Agent Ward assaulted Sims and pushed him to the floor. Sims was seriously injured. On March 24, 1976 Respondent's executive board member Duke and two other individuals at the hall threatened to injure or kill Sims. Duke said that they had to get rid of all the s-o-b's and the best thing to do would be to shoot Sims and the rest of the NLRB witnesses.

Respondent's Business Agent Wagner listened to the threats with a smile on his face and said nothing.

engaged in violence and threats of violence to enforce their practice of backdooring employees. The actions of the business agents were such as to give applicants for employment a reasonable basis for believing that access to employment depended on securing the good will of the business agents rather than on the objective criteria of the hiring hall.

The ALJ determined that the Union breached its duty of fair representation by its backdooring practices, and therefore, it breached §§ 8(b)(1)(A) and 8(b)(2) of the Act. It recommended that the Union be ordered to operate its hiring hall in accordance with the collective bargaining agreement. It also recommended that the Union be ordered to make whole the workers injured by the Union's referral practices. Although the individual discriminatees were not identified at the hearing, the ALJ believed that the General Counsel should be allowed to prove the identity of the discriminatees at a backpay proceeding.

Both parties filed exceptions.[4] With one modification, the Board adopted the order and findings of the ALJ. 228 N.L.R.B. 1420 (1977).

> The Board found that
> (a)lthough the threats and the act of violence were not specifically alleged in the complaint to violate the Act, they are closely related to and indicative of the manner in which the hiring hall was operated and, therefore, fall within the general allegation of the complaint that Respondent violated the Act by operating its hiring hall in an arbitrary, capricious, and unfair manner.

*Id.* As a result, it amended the order to include a violation of § 8(b)(1)(A) for the threats and violence in which the Union engaged. The Board now petitions for enforcement.

By its silence, the Union concedes that substantial evidence supports the Board's findings that the Union circumvented hiring hall procedures specified in the collec-

tive bargaining agreement and engaged in threats and acts of violence against workers who objected to these practices. The Union, however, objects to the legal significance of these findings and raises a number of procedural issues. Specifically, the Union contends that (1) the findings of the Board concerning the acts of violence and threats were neither alleged nor litigated and therefore cannot be the basis for a violation of the National Labor Relations Act; (2) the Board violated due process when it failed to inform the Union in the course of the hearing of the names of the illegal referrals; (3) absent a finding of discriminatory motive or intent, there is no violation of § 8(b)(1)(A) or 8(b)(2); (4) where no discriminatees are identified at the hearing, there may be no post-hearing proceeding at which the discriminatees may be identified; and (5) it was denied due process when a settlement agreement was set aside.

I

## Failure to Allege Threats and Acts of Violence in Complaint

The Board found that the Union violated § 8(b)(1)(A) by engaging in threats and acts of violence against workers opposing the Union's hiring hall practices. The Union argues that it was denied due process because these acts were not specifically alleged in the Board's complaint.

We cannot agree. The Board may properly find an unfair labor practice when the issue has been fully litigated even though not specifically pleaded in the complaint. *E.g., Alexander Dawson, Inc. v. NLRB,* 586 F.2d 1300, 1304 (9th Cir. 1978); *Free-Flow Packaging Corp. v. NLRB,* 566 F.2d 1124, 1131 (9th Cir. 1978); *NLRB v. Klaue,* 523 F.2d 410, 414–15 (9th Cir. 1975). The Board may either render a decision upon the issues actually tried or order an amendment to conform with the proof. *Alexander Dawson, Inc.,* 586 F.2d at 1304;

---

4. The General Counsel excepted to the Administrative Law Judge's failure to find eight other illegal referrals.

*Frito Co. v. NLRB,* 330 F.2d 458, 465 (9th Cir. 1964).

■ It is apparent that the issue of threats and violence were fully and fairly litigated. The record is replete with evidence documenting the occurrences of these acts. For the most part, this evidence was corroborated and uncontradicted. Although the Union contends that ALJ treated the incidents only as background, the ALJ in fact devoted two full pages to the incidents of violence, referencing his discussion with numerous citations to the evidentiary record. Furthermore, the Union did not move for a bill of particulars, did not object to the introduction of the evidence or move for a continuance, and cross-examined the relevant witnesses.

■ In any event, the Board's position that the acts and threats of violence were within the general language of the complaint is reasonable. These acts were as much a part of the unfair operation of the hiring hall as the improper referral practices.

## II

### Method of Proving Illegal Referrals

■ The Union argues that it was denied due process because the complaint did not specifically allege the identity of the persons improperly referred, and because the Union did not know until the last day of trial the names of the individuals who received an illegal referral.

Again, it was not necessary that the Board amend its complaint to include the identity of each illegal referral. The identities of those persons was fully litigated, and as the Board points out, the Union never filed a bill of particulars or sought additional information on this matter, but answered the complaint and amendments to the complaint without raising any due process issues.

Moreover, the general procedure employed by the General Counsel for identifying the illegal referrals was reasonable. The General Counsel first called the employer witnesses to the stand to support the admission of lists of all employees hired for a particular job. Next, the persons who did the hiring for the employer testified as to the method (e. g., "open-order" or "by-name") by which the particular employees were hired. The charging party, Kusterns, who had compiled a list of the dispatches made during the period in which the practices occurred, then testified for each day of the period how many calls were made and which company made them. At the close of this evidence, the general counsel collated the results in an exhibit that identified which persons were improperly referred.

Given the number of violations to be proved, the Board's procedure of proof was an orderly method of identifying the illegal referrals. The Union's characterization of the exhibit as "evidence" first introduced at the "end of the hearing" is somewhat misleading. The exhibit introduced by the General Counsel was merely a culmination of the testimony and exhibits that the Union had an ample opportunity to examine during the course of the hearing. It was introduced at the end of the hearing only because the Union chose not to present its own witnesses or move for a continuation of the hearing.

## III

### Violations of the Act

The only real substantive issue raised by the Union is whether the practice of illegal referrals constitutes a violation of §§ 8(b)(1)(A) and 8(b)(2). The Union contends that there can be no violation of the sections without a finding that the Union had a discriminatory motive or intent. According to the Union, "the facts can best be described as a granting of certain referral preferences without any suggestion that those preferences were granted because of union activity or lack thereof."

■ Even though the Board did not make findings that the illegal referrals were motivated by an intent to encourage Union membership, we have no difficulty in concluding the illegal referrals violated the

National Labor Relations Act. On a number of previous occasions, we have held that it is an unfair labor practice in violation of §§ 8(b)(1)(A) and 8(b)(2) for a bargaining representative to act in an unreasonable, arbitrary, or invidious manner in regard to an employee's employment status. *Kling v. NLRB,* 503 F.2d 1044, 1046 (9th Cir. 1975). *See, e.g., NLRB v. Bricklayers Local No. 7,* 563 F.2d 977 (9th Cir. 1977). By wielding its power arbitrarily, the Union gives notice that its favor must be curried, thereby encouraging membership and unquestioned adherence to its policies. *Laborers and Hod Carriers Local No. 341 v. NLRB,* 564 F.2d 834, 839–40 (9th Cir. 1977). No specific intent to discriminate on the basis of union membership need be shown; if the foreseeable result of discrimination is the encouragement of union membership, it must be supported by a legitimate purpose. *Id.* The natural consequence of referral preferences is to encourage membership. *NLRB v. International Longshoremen's Union, Local 13,* 549 F.2d 1346, 1353 (9th Cir.), *cert. denied,* 434 U.S. 922, 98 S.Ct. 397, 54 L.Ed.2d 279 (1977).

▇ The Union's collective bargaining agreement contained an explicit and unambiguous procedure governing the dispatch of job applicants.[5] The Board's uncontested findings showed that the Union's business agents made 76 referrals in violation of the terms of the agreement. These violations were not isolated. Rather, they were part of a systematic and continuous pattern of abuse in which Union business agents divided the Union's jurisdiction into "fiefdoms from which they dispensed patronage", openly backdooring referrals in violation of the agreement. The applicants who objected to the practice were faced with threats and acts of violence. The Union offered no reasons, legitimate or otherwise, to justify its practices. In these circumstances we conclude that the Union's arbitrary display of power violated §§ 8(b)(1)(A) and 8(b)(2)

of the Act. *See Laborers and Hod Carriers Local No. 341,* 564 F.2d at 839–40. As the Board found, the natural and foreseeable consequences of a system by which the Union's agents arbitrarily dispensed their patronage was to encourage loyalty of the job applicants to the Union and its agents. *See International Longshoremen's Union Local 13,* 549 F.2d at 1353.

## IV

### Backpay

The General Counsel did not introduce evidence of the identity of the individual discriminatees at the hearing. The Board held that, although the discriminatees were as yet unknown, the matter of identifying the discriminatees and computing the amount of backpay owed them should be reserved for a post-enforcement compliance proceeding. The Union contends that the backpay award was improper, because the individual discriminatees cannot possibly be identified, and even if they could, the litigation of the matter is inappropriate at the compliance stage of the proceedings.

▇ The remedial power of the Board under § 10(c), 29 U.S.C. § 160(c), is a broad discretionary one, subject only to limited judicial review. *NLRB v. J. H. Rutter-Rex Manufacturing Co.,* 396 U.S. 258, 260, 90 S.Ct. 417, 24 L.Ed.2d 405 (1969); *Fibreboard Corp. v. NLRB,* 379 U.S. 203, 216, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). An award of backpay is within the Board's remedial power; such an award is a reparation order designed to vindicate the public policy of the statute by making the employees whole for losses suffered on account of an unfair labor practice. *J. H. Rutter-Rex Manufacturing Corp.,* 396 U.S. at 260, 90 S.Ct. 417. *See Golden State Bottling Corp. v. NLRB,* 414 U.S. 168, 188, 94 S.Ct. 414, 38 L.Ed.2d 388 (1974). When the Board, in the exercise of its informed discretion makes a

---

5. The Board has taken the position that where a referral under an exclusive hiring hall agreement is conditioned upon clear and unambiguous standards, the refusal to employ an employee who qualifies for referral, without more, suffices to establish a prima facie violation of §§ 8(b)(1)(A) and 8(b)(2). In such cases, discriminatory motivation is presumed. *International Brotherhood of Electrical Workers, Local 592,* 223 NLRB 899, 901 (1976).

backpay order, the order should stand unless it can be shown that the order is a patent attempt to achieve ends other than those that can be fairly said to effectuate the policies of the Act. *J. H. Rutter-Rex Manufacturing Corp.*, 396 U.S at 263, 90 S.Ct. 417; *NLRB v. Seven-Up Bottling Co.*, 344 U.S. 344, 346–47, 73 S.Ct. 287, 97 L.Ed. 377 (1953).

In computing backpay claims, the Board has typically taken a two-step approach. *See Vapor Blast Independent Shopworkers Association v. Simon*, 305 F.2d 717, 719 n.3 (7th Cir. 1962). The determination whether an unfair labor practice has occurred and whether backpay should be ordered is determined at the first stage. After enforcement has been granted, the specifics of compliance are determined at the second stage. This two-step approach has been approved by the Supreme Court, *see J. H. Rutter-Rex Manufacturing Corp.*, 396 U.S. at 260, 90 S.Ct. 417; *NLRB v. Deena Artware*, 361 U.S. 398, 411, 80 S.Ct. 441, 4 L.Ed.2d 400 (1960) (Frankfurter, J., concurring), and by this court. *See Polynesian Cultural Center, Inc. v. NLRB*, 582 F.2d 467 (9th Cir. 1978).

[11] The Union contends, however, that, the determination of the identity of the discriminatees would require the "relitigation" of substantive issues, and therefore, this issue cannot be left for resolution at the compliance stage. We disagree. Although the identification of the individual discriminatees may require more litigation than is typical for backpay proceedings, we think that the Board acted in its discretion in reserving the issue until after enforcement.

Often the only issue for resolution at a compliance proceeding following a backpay order is the computation of the amount to be awarded. *See, e. g., NLRB v. Teamsters Hawaii Local 996*, 313 F.2d 655, 659 (9th Cir. 1963). However, the Board on numerous occasions has reserved the determination of complex factual issues for the compliance proceedings, a practice that the Courts of Appeals have approved. *See Great Chinese American Sewing Co. v.*

*NLRB*, 578 F.2d 251, 255–56 (9th Cir. 1978) (questions relating to amount of backpay, including whether employees made reasonable attempts to secure employment and whether their employment would have ceased for independent reasons, may be explored in compliance proceedings); *NLRB v. Globe Manufacturing Co.*, 580 F.2d 18 (1st Cir. 1978) (whether employee would have been recalled for work had he been properly considered and whether he was physically able to return to work left for compliance proceedings); *NLRB v. Eagle Material Handling, Inc.*, 558 F.2d 160, 171 (3d Cir. 1977) (whether reinstatement had been refused to striking employee or whether offer of reinstatement was unconditional are matters to be determined at compliance stage); *Chemvet Laboratories v. NLRB*, 497 F.2d 445, 453 (8th Cir. 1974) (determination of the amount of overtime an employee might have worked but for illegal discharge is best left to compliance stage for resolution); *Trico Products Corp. v. NLRB*, 489 F.2d 347, 353–54 (2d Cir. 1973) (reserving the determination of when the employees would have been laid off for valid economic reasons for the compliance proceedings); *Rogers Manufacturing Co. v. NLRB*, 486 F.2d 644, 649 (6th Cir. 1973) (the determination of which of fourteen strikers is not entitled to reinstatement left to compliance proceedings); *NLRB v. McMahon*, 428 F.2d 1213 (9th Cir. 1970) (whether employee who was unlawfully interrogated and threatened is entitled to backpay may be considered during compliance stage); *NLRB v. Dazzo Products, Inc.*, 358 F.2d 136, 138 (2d Cir. 1966) (employer's precise duties as to reinstatement of and backpay for temporary employee to be resolved in compliance proceedings); *Majestic Molded Products, Inc. v. NLRB*, 330 F.2d 603, 607–08 (2nd Cir. 1964) (whether laid-off employees were unqualified to work for affiliated employer can be shown in compliance proceedings).

These cases demonstrate the significant degree of discretion the courts have accorded the Board in allowing it to administer the enforcement of a backpay order in compliance proceedings. The fact that backpay

must be computed for a sizeable number of discriminatees is not a persuasive argument against this approach. Because the determination of whether unfair labor practices have occurred is itself subject to judicial review, there is always a substantial risk that extensive proceedings to determine the amount of liability may be rendered superfluous by a reversal of the underlying violation. *Deena Artware,* 361 U.S. at 411, 80 S.Ct. 441 (Frankfurter, J., concurring). We think that leaving the identification of the discriminatees and the backpay due them to the compliance stage of the proceedings represents an orderly and efficient means for processing backpay orders in this kind of case.[6]

The Union contends that it is futile to allow the determination of the issues at a compliance proceeding because "no individual discriminatee can ever be identified." We do not share the Union's pessimism. The backpay obligation is limited to remedying the 76 particular incidents of backdooring found by the Board. The Union's out-of-work list will identify the applicants who were eligible for referral when the Union backdoored these jobs. The General Counsel will then have to show that the individuals were in the hiring hall when the call was made and would have met the criteria for dispatch that were set forth in the contract. As the Board acknowledged, the General Counsel may be unable to identify which employees would have filled the jobs had the Union followed the procedures in the contract. We agree with the Board that the General Counsel should be given the opportunity to try.

We can perceive no unfairness to the Union by affording the General Counsel this opportunity. The Union will be given an opportunity to contest the claims for backpay at the compliance proceeding, *see, e. g., NLRB v. Globe Manufacturing Co.,* 580 F.2d 18 (1st Cir. 1978); *Zim's Foodliner,*

*Inc. v. NLRB,* 495 F.2d 1131, 1144 (7th Cir. 1974). Further, the Union may seek this court's review of the Board's determination. *See Polynesian Cultural Center, Inc.,* 582 F.2d at 476.

In short, we do not think that the difficulties that the General Counsel may have in identifying discriminatees makes an award of backpay any less appropriate. Such a matter merely affects the scope of the remedy and not the nature of the violation. *See Standard Fruit and Steamship Co.,* 211 NLRB 121 (1974). Where, as here, specific instances of discrimination have been proven, an award of backpay is necessary to rectify the presumptive harm that has been caused. Given that violations of the Act have been proved and enforcement of the order is warranted, we need not speculate on whether the General Counsel will be able to prove the identity of all the discriminatees. The policies of the Act are effectuated by giving the General Counsel the opportunity to do so.

V

Withdrawn Settlement

■ In July 1975 the Regional Office proposed a settlement, which the Union accepted, that provided for a cease and desist order and backpay for three individuals. In November 1975 the acting General Counsel disapproved the settlement. The Union contends that without "adequate explaination (sic) from the Board as to why the settlement was set aside and the matter forced to trial, the denial of due process is evident."

This argument has no merit. The proposed settlement included a stipulation that specifically required the approval of the General Counsel. The General Counsel apparently rejected the settlement because the charging party objected to the fact that it provided backpay to only three individu-

6. On previous occasions, the Board has reserved the identification of the discriminatees for the compliance proceedings. *See, e.g., Wayne Electric Co.,* 226 NLRB 409 (1976); *International Brotherhood of Boilermakers Local 101,* 206 NLRB 30 (1973). Only when the rec-

ord fails to show that applicants other than the charged party were discriminated against has the Board refused to reserve this determination. *See Local 851, International Longshoreman's Association,* 194 NLRB 1027 (1972). This is not the case here.

als despite the allegation that numerous ironworkers had been injured. In light of the Board's subsequent findings and our holding here, the decision to reject the settlement was clearly reasonable. Furthermore, the rejection of the settlement caused no substantial delay in the proceedings. The General Counsel returned the case for further investigation in November 1975, only four months after the Regional Office had submitted the settlement for approval. Although the hearing was not commenced until June 1976, most of this delay was due to the Union's lack of cooperation in the Regional Office's continuing investigation. As the Union's counsel admitted at the hearing, "I do not seek to place on the shoulders of the Board or the General Counsel's office the responsibility for any postponements after December of 1975."

Even if the Board was to blame for this delay, the Union's contention is groundless. The Union has not shown, and we cannot find, any prejudice to the Union resulting from the delay.

ENFORCEMENT GRANTED.