**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SAV–ON DRUGS, INC., Respondent.**

No. 81–7428.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 9, 1982.

Decided April 28, 1983.

Rehearing Granted Sept. 1, 1983.

Elliott Moore, Washington, D.C., Roger W. Goubeaux, Los Angeles, Cal., for petitioner.

Thomas S. Kerrigan, McLaughlin & Irvin, Los Angeles, Cal., for respondent.

Before CHAMBERS, WALLACE and NORRIS, Circuit Judges.

CHAMBERS, Circuit Judge:

The National Labor Relations Board (the Board) petitions for enforcement of its order issued December 18, 1980, requiring Sav-On Drugs, Inc. (Sav-On) to reinstate and pay back wages to approximately sixty employees it terminated, on the ground the terminations violated section 8(a)(3) and (1) of the National Labor Relations Act (the Act).

Sav-On operated a chain of retail drug stores in California, Texas and Nevada. In mid-1979, Sav-On operated approximately 123 stores in California, some three-quarters of which were covered by identical collective bargaining agreements with various locals of the United Food and Commercial Workers International Union, AFL–CIO, formerly the Retail Clerks International Union (the Union). The contracts had an expiration date of June 30, 1978, and covered all of the employees in these stores, including the pharmacists and pharmacist managers.

Beginning May 1, 1978, petitions were filed with the Board by the Guild for Professional Pharmacists (the Guild) seeking to represent all pharmacists employed by Sav-On in its California stores. Eleven petitions were consolidated for a hearing after which, on September 26, 1978, the regional director issued a decision holding that the employees in the classification "pharmacist manager" were "supervisors" within the meaning of section 2(11) of the Act, and

that the Guild was dominated by pharmacist managers and therefore was not a labor organization within the meaning of section 2(5) of the Act. 29 U.S.C. § 152(5) and (11). The regional director simultaneously dismissed the Guild's petition for representation. The Guild sought no stay of that dismissal.

On October 6 the Guild filed a timely request for review of the regional director's decision and served Sav-On. On November 6 the Guild wrote Sav-On seeking wage increases for the pharmacists and threatened to strike if its demands were not met. Sav-On had, however, also received demands from the Union for the resumption of negotiations for a new agreement to replace the one that had expired on June 30, 1978. Sav-On responded to the Guild by referring to the regional director's decision and reporting that the Union was insisting on renewed negotiations.

On November 8, Sav-On and the Union entered into an agreement to extend the expired contract as to pharmacists who were not in a "supervisory" role. On the same day the Board granted the Guild's request for a review.

Between November and January increased pressure was exerted by the Guild and active in the Guild activities were pharmacist managers Kunysz and Fogel. On January 5, 1979, Sav-On discharged the two pharmacist managers because of their Guild activities. The Guild thereupon filed unfair labor practice charges against Sav-On, demanded that Kunysz and Fogel be reinstated, and threatened to strike if they were not. The two were not reinstated. Shortly thereafter, 59 pharmacists and pharmacist managers from both organized and unorganized stores engaged in a strike to protest the discharges. Sav-On responded by discharging the strikers. Since that time Sav-On has refused to reinstate the strikers or the two discharged managers, Kunysz and Fogel.

Six months after the discharges, and eight months after the regional director ruled in Sav-On's favor on the representation case, the Board issued its decision on review reversing the regional director and finding that the Guild was a labor organization within the meaning of the Act and that the pharmacist managers were not supervisors under section 2(11) of the Act. It ordered an election in a statewide unit of Sav-On's pharmacists and pharmacist managers.

In the unfair labor practice case, the Board found that Sav-On violated section 8(a)(3) and (1) of the Act by discharging pharmacist managers Kunysz and Fogel because of their union activities and by discharging the employees who struck to protest these discharges. The Board's order required Sav-On to cease and desist from the unfair labor practices found, and ordered it to offer immediate reinstatement to all the discharged employees and to pay back wages.

Section 8(a)(1) makes it unlawful for an employer "to interfere with, restrain, or coerce employees" in the exercise of their right to organize. 29 U.S.C. § 158(a)(1). Under section 8(a)(3) of the Act, an employer may not discharge employees because of their union activities or sympathies. 29 U.S.C. § 158(a)(3); *NLRB v. Fort Vancouver Plywood Co.,* 604 F.2d 596, 600 (9th Cir.1979), *cert. denied,* 445 U.S. 915, 100 S.Ct. 1275, 63 L.Ed.2d 599 (1980). An administrative law judge found that the firing of Kunysz and Fogel was an undisputed prima facie violation of these two sections. Relying on Sav-On's stipulation that Kunysz and Fogel were discharged because of their activities on behalf of the Guild, and relying on the Board's decision on review that the Guild was a labor organization, he concluded that the actions of the employees were union activities. Sav-On does not dispute that a prima facie case of violation has been made out, but argues that it cannot fairly be held in violation of the Act because it was entitled to rely on the regional director's decision under section 3(b) of the Act.

Prior to 1959, decisions on representation petitions were made by the Board itself. Congress then amended the Act to provide for the delegation of Board authority to

regional directors in representation cases. Section 3(b) provides in part:

> The Board is also authorized to delegate to its regional directors its powers under section 159 of this title to determine the unit appropriate for the purpose of collective bargaining, to investigate and provide for hearings, and determine whether a question of representation exists ... except that upon the filing of a request therefor with the Board by any interested person, the Board may review any action of a regional director delegated to him under this paragraph, but such a review shall not, unless specifically ordered by the Board, operate as a stay of any action taken by the regional director.

Decisions of the regional director are not merely advisory opinions or recommendations entitled to no meaningful weight. *See Transportation Enterprises, Inc. v. NLRB,* 630 F.2d 421, 425–27 (5th Cir.1980). The legislative history of section 3(b) confirms the breadth of the intended delegation: "[This new provision is] designed to expedite final disposition of cases by the Board, by turning over part of its caseload to its regional directors for *final determination.*" 105 Cong.Rec. 19770 (1959) (emphasis added). The regulations of the Board state that the decision of the regional director shall be final, provided, however, that any party may seek review within ten days after service of the decision. 29 C.F.R. § 102.67(b). Section 101.21(a) of the regulations explicitly states that a regional director's decision is final "subject to the review procedure set forth" in the regulations. Thus, it has been held that decisions rendered by regional directors which are not reviewed by the Board are entitled to the same weight and deference as Board decisions. *Transportation Enterprises, Inc. v. NLRB, supra,* 630 F.2d at 426; *NLRB v. Gold Spot Dairy, Inc.,* 432 F.2d 125, 127 (10th Cir.1970).

It is clear from the Act and the regulations that once review *has* been granted by the Board under section 3(b), the regional director's findings are subject to modification or reversal. Indeed, given that review by the Board is discretionary and that the grounds for review listed in the regulations are quite limited (see *Magnesium Casting Co. v. NLRB,* 401 U.S. 137, 142, 91 S.Ct. 599, 601–602, 27 L.Ed.2d 735 (1971); *Transportation Enterprises, Inc. v. NLRB, supra,* 630 F.2d at 425–26) it can fairly be said that all of the parties are on notice that the decision of the regional director should not be fully relied upon until completion of the Board's review.

Sav-On argues that it was entitled to rely on the regional director's decision in the absence of a stay, saying that his decision remains final and action taken in reasonable reliance upon it should remain insulated from any later action of the Board on review. Section 3(b) of the Act does appear to be consistent with the rule of this Circuit that an appeal will not affect the validity of the judgment or order during the pendency of an appeal, absent a stay or supersedeas. *Matter of Combined Metals Reduction Co.,* 557 F.2d 179, 190 (9th Cir.1977).

The Guild counters with an argument that there was nothing to stay. There are, of course, other situations where stays are more obviously useful, e.g. a stay of an order calling for an election. In this case the regional director did not order an election. He ruled against the Guild in its representation claims and he then went a further step; he dismissed its representation petition. Yet the Guild made no attempt to obtain a stay of that dismissal. We must inquire whether application for a stay would have served the purposes of the Act.

Stays are commonly used to maintain the status quo during an appeal and the status quo very obviously should have been maintained in this case. The purposes of the Act are best served when, in a situation such as this, all parties attempt to preserve the status quo. The Board has held that it was Sav-On's duty to refrain from bargaining with either of the unions until the question of representation was finally resolved by the Board on review. But the case demands an inquiry into the forces that generated the disruption of the status quo and

placed Sav-On in the situation where it had to decide to act or refrain from acting.

Had the Guild set the tone for the attitudes of the parties during the review period, by confronting the Board with the necessity to exercise its power to stay the regional director's dismissal of its representation petition, and to exercise its power thereafter to assure maintenance of the status quo, the unfortunate events that occurred here might well have been avoided. Instead, the Guild took no action to obtain a stay and, acting as if the review gave it carte blanche to proceed unilaterally in its self-interest, it made wage demands and threatened strike activity if its demands were not met.

The Union, encouraged by the regional director's ruling against the Guild, contributed to the disorder by demanding a resumption of the negotiations that had been halted during the Guild's representation efforts. We cannot say how the Union would have responded if the Guild had sought a stay.

Sav-On found itself confronted by the demands of the two contesting unions and the provocative activities of two pharmacist managers (held by the regional director to be part of the management force) as they labored adversarily for the Guild. As the confrontation gathered momentum Sav-On would have to anticipate greater economic loss and greater administrative turmoil. Caught in the crossfire, it chose to resume negotiations with the incumbent Union assuring, as it did so, to restrict the Union's representation to nonsupervisory employees within the definitions made by the regional director. Sav-On might better have refrained from dealing with either of the contesting unions, but the basic question is that of assessing where the disruption of the status quo began and who was responsible for it. It was the employees through their unions, acting unilaterally and in utter disregard of their duty to maintain the status quo, who placed Sav-On in the position where it found itself. It was the employees, through their unions, who had the initial ability to assure preservation of the status quo during the review period, but who instead set in motion a chain of events that led to their eventual dismissal.

The purposes of the Act are not served by disregarding settled principles of equity and ignoring the provocative activity of parties who claim a right to relief. Our decision is not so much an affirmation of Sav-On's activities as it is a condemnation of the unions' activities in disturbing the status quo during the period of the review.

On these facts we decline to enforce the Board's order.

NORRIS, Circuit Judge, dissenting:

Rather than treating this matter as a routine case of enforcement of a Board order which is based upon findings supported by substantial evidence in the record as a whole, *NLRB v. World Evangelism, Inc.,* 656 F.2d 1349, 1352 (9th Cir.1981); *Stephens Institute v. NLRB,* 620 F.2d 720, 726 (9th Cir.), *cert. denied,* 449 U.S. 953, 101 S.Ct. 358, 66 L.Ed.2d 217 (1980), the majority refuses to enforce the Board's order by invoking, without citation of authority, some vague and unarticulated doctrine of fairness.

I

It is well established that an employer violates section 8(a)(3) and (1) of the Act when it discharges employees because of their union activities. *See NLRB v. Fort Vancouver Plywood Co.,* 604 F.2d 596, 599 & n. 1, 600 (9th Cir.1979), *cert. denied,* 445 U.S. 915, 100 S.Ct. 1275, 63 L.Ed.2d 599 (1980); *Santa Fe Drilling Co. v. NLRB,* 416 F.2d 725, 729 (9th Cir.1969). Here, Sav-On stipulated that pharmacist managers Kunysz and Fogel were discharged because of their activities on behalf of the Guild, and it did not challenge the administrative law judge's conclusion, based on the Board's decision in the representation case, that Kunysz and Fogel were employees, not supervisors. Thus, as the majority is forced to concede, an undisputed *prima facie* case of violation of the Act has been made out.

Sav-On argues, however, that it cannot fairly be held to have violated section 8(a)(3) and (1) because of the regional director's initial decision that Kunysz and Fogel were supervisors. According to Sav-On, it was entitled to rely upon the decision of the regional director as final and binding upon it until such time as the Board reversed the decision, notwithstanding the fact that it knew not only that the Guild had petitioned for review, but that *review had been granted by the Board.* Sav-On further contends that Congress' intent that a regional director's decision should be "final and binding" despite the pendency of an appeal is shown by that portion of section 3(b) of the Act which provides that the Board's decision to review the action of a regional director "shall not, unless specifically ordered by the Board, operate as a stay of [that] action." 29 U.S.C. § 153(b) (1976). Sav-On points out that no stay issued here. Finally, Sav-On appears to contend, as it argued before the Board, that it had to discharge Kunysz and Fogel lest it subject itself to unfair labor practice charges for permitting its supervisors to engage in activities on behalf of the Guild at a time when the Union, and not the Guild, was certified to represent its employees.

These arguments are without merit. First, there is no basis for Sav-On's assertion that it had a right to rely on the regional director's decision until that decision was reversed by the Board, even though it knew that the Board had granted review. It is an inherent characteristic of our legal system that, where levels of review are provided and parties resort to them, the decisions and findings of an infe-

rior forum may ultimately be reversed by a higher tribunal. Litigants are presumed to understand this risk.[1] Neither the procedures provided under the Act for review of a regional director's decision nor the results which flow from resort to those procedures are in any way novel in this respect. Thus, section 3(b) of the Act, which authorizes delegation to the regional directors of certain of the Board's powers in representation cases, provides that any interested person may seek review of a decision of the regional director and that the Board, in its discretion, may grant such review. The Board has further amplified this right to seek review by providing in its rules and regulations that "[i]n the event the regional director decides the issues in a case, his decision is final *subject to the review procedure set forth*" in the rules and regulations, 29 C.F.R. § 101.21(a) (1982) (emphasis added), and also that "[t]he decision of the regional director shall be final: *Provided, however, That* within 10 days after service thereof any party may file . . . a request for review with the Board," 29 C.F.R. § 102.67(b) (1982). Section 102.67(c) then explains:

> The Board will grant a request for review only where compelling reasons exist therefor. Accordingly, a request for review may be granted only upon one or more of the following grounds:
>
> (1) That a substantial question of law or policy is raised because of (i) the absence of, or (ii) a departure from, officially reported Board precedent.
>
> (2) That the regional director's decision on a substantial factual issue is clearly erroneous on the record and such error prejudicially affects the rights of a party.

---

1. The options which Sav-On faced after the regional director's decision are not significantly different from those which any litigant faces when he obtains a favorable judgment from an inferior forum. For instance, if a party receives a declaratory judgment by a lower court that his product does not infringe on an existing patent and he subsequently manufactures and sells his product in reliance on that judgment, there is no doubt that he will be liable for patent infringement if a higher tribunal reverses the earlier decision and finds infringement. Once the patent holder files a timely appeal,

the prevailing plaintiff acts at his peril when he relies on the lower court decision. *Cf. FTC v. Weyerhaeuser Co.,* 648 F.2d 739, 741–42 (D.C. Cir.1981) (one who acts with knowledge that an appeal is pending from a district court order refusing to enjoin the action taken acts at his peril, and a mandatory injunction may issue restoring the status quo); *see also Young Women's Christian Association v. Kugler,* 463 F.2d 203, 204 (3d Cir.1972) (a party's actions relying on a declaratory judgment while its appeal is pending are taken at that party's peril if the judgment should be reversed).

(3) That the conduct of the hearing or any ruling made in connection with the proceeding has resulted in prejudicial error.

(4) That there are compelling reasons for reconsideration of an important Board rule or policy.

29 C.F.R. § 102.67(c) (1982).

These provisions make it amply clear to litigants that a decision of the regional director, like the decisions of most inferior tribunals, is *not* final and *cannot* safely be relied upon so long as a request for review can still be timely filed, or when review has been requested and granted by the Board. *See Transportation Enterprises, Inc. v. NLRB*, 630 F.2d 421, 425–26 (5th Cir.1980). Litigants before the Board are "charged with knowledge of the Board's powers and functions and, therefore, of the limitations placed by law upon the authority and actions of its subordinates." *NLRB v. Armstrong Tire & Rubber Co., Tire Test Fleet Branch*, 263 F.2d 680, 682 (5th Cir.1959). Accordingly, once review has been granted, all parties are on notice that the Board will review the regional director's findings and that those findings are subject to modification or reversal. Indeed, given the nature of the grounds listed in 29 C.F.R. § 102.-67(c) for a grant of review by the Board—a substantial question of law or policy raised, a clearly erroneous factual determination, a significant procedural error, and a need for reconsideration of an important Board rule or policy—the prudent litigant should realize that if the Board has granted review of the regional director's decision there is a substantial possibility that that decision will be reversed. Certainly one who takes action under these circumstances must be aware that he acts at his peril.

For these reasons Sav-On, which was well aware when it discharged the two pharmacists that an appeal reviewing their status was pending before the Board, cannot argue that it was surprised or unfairly prejudiced either by the Board's action in reversing the regional director's decision or by the Board's subsequent conclusion that the discharges constituted an unfair labor practice.

Having chosen to act in this climate of uncertainty, Sav-On cannot now complain of unfair treatment.

## II

Nor is Sav-On's position advanced by the argument that the regional director's decision had some greater force or finality because it was not stayed. Both the Act and the Board's rules and regulations make it clear that decisions of the regional director become final only if the time for taking an appeal runs without an appeal being taken or a request for review is made by a party and then denied by the Board. Once a request for review is made and granted, the regional director's decision is precluded from ripening into a final decision. This circumstance cannot be altered by the actions of the parties in seeking or choosing not to seek a stay. Hence, while section 3(b) of the Act indeed provides that review by the Board "shall not, unless specifically ordered by the Board, operate as a stay of any action taken by the regional director," this language means only that parties who have been directed by the regional director to take some action—most often, to proceed to an election—must do so regardless of the pendency of the appeal, unless they obtain a stay. As Congressman Kearns of Pennsylvania stated in discussing this language shortly before it was enacted, it was intended merely "to avoid the taking of an appeal as a delaying technique." 2 Office of General Counsel, NLRB, *Legislative History of the Labor-Management Reporting and Disclosure Act of 1959* 1750 (1959).

In the instant case, as the administrative law judge observed, since the regional director's decision had dismissed the Guild's representation petition, "there [was] no action to be taken by [the] regional director or by the parties," and, accordingly, "no need or purpose for a stay order to be either requested or issued." *See generally* 4A C.J.S. *Appeal and Error* § 632 (1957) (generally, parties can obtain a stay "of any appealable judgment, order, or decree which *commands or permits some act to be done* or which is of a nature to be actually

enforced against the party affected ") (emphasis added); *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.,* 559 F.2d 841, 843 (D.C.Cir.1977) (to obtain a stay in the federal courts one must show, *inter alia,* that without such relief he will be irreparably injured). It would have been pointless for the Guild, which filed the request for review, to seek a stay because the regional director's decision neither commanded nor permitted any act to be done, and the Guild thus had no need for a stay. There was nothing to stay because there was no order directing or restraining anyone from doing anything. In this circumstance, a stay could not properly have issued. Hence, the Guild's decision not to seek a stay is irrelevant to the question of the finality of the regional director's decision.

The majority argues that the Guild is responsible for Sav-On's violations of the Act because of its contentious union campaigning and failure to seek a "stay" pending appeal of the regional director's decision. However, whether Sav-On acted while caught in an economic "crossfire" in part created by the Guild's union activities or wholly avoidable by the issuance of a stay is an issue neither raised before the Board nor argued on appeal by Sav-On. The majority's reliance on this *ratio decidendi* therefore requires a factual determination to have been made by the Board of Sav-On's anticipated "economic loss" and "administrative turmoil" which was not made. Sav-On has instead only argued a theory of legal duress, that, once the regional director's decision issued, it was forced to resume negotiations with the Union lest it face refusal-to-bargain charges under section 8(a)(5) of the Act, 29 U.S.C. § 158(a)(5) (1976). According to Sav-On, it had no choice but to terminate Kunysz and Fogel after the regional director's decision declared the pharmacist managers to be supervisors and confirmed the Union's right to represent Sav-On's pharmacist employees by dismissing the Guild's petitions. Sav-On argues that a failure to discharge Kunysz and Fogel at that point would have subjected Sav-On to unlawful assistance charges

under section 8(a)(2) of the Act, 29 U.S.C. § 158(a)(2) (1976), for permitting its supervisors to campaign for a rival union.

In order to reach its conclusion that the Guild is responsible for Sav-On's negotiations with the Union and, therefore, somehow also responsible for the unfair labor practices subsequently committed, the majority appears to have accepted this reasoning. This argument is, of course, merely a variation of Sav-On's earlier contention that it had a right to rely on the regional director's decision, despite the pendency of the Guild's petition for review, until such time as the Board's decision issued. But these arguments must fail because, as already shown, Sav-On did not have a right to rely on the regional director's decision when it knew that an appeal was pending. Nor is it true that Sav-On would have been guilty of unlawfully assisting the Guild if it had failed to terminate Kunysz and Fogel for their activities on behalf of that union. So long as the Guild's appeal was pending, it was uncertain whether the Union would or would not prevail as the bargaining representative for Sav-On's pharmacists. Accordingly, Sav-On was *not* obliged to behave as if Kunysz and Fogel were supervisors campaigning for a rival union in derogation of the certified bargaining representative. If Sav-On was concerned with insuring that Kunysz and Fogel's conduct would not be attributed to management, it had only to explain to its employees that, so long as the appeal was pending, the pharmacist managers had a right to campaign for the Guild but that they did not speak for management which wished to remain neutral until the Board decided which union would represent the pharmacists. Such a statement to employees would almost certainly have insulated Sav-On against charges that it had rendered unlawful assistance to the Guild. *See Ohio Rubber Co., a Division of the Eagle-Picher Co.,* 152 N.L. R.B. 1121, 1125 & n. 3 (1965); *Livingston Shirt Corp.,* 107 N.L.R.B. 400, 402–03 (1953); *Westinghouse Electric Corp.,* 91 N.L.R.B. 955, 956–57 & n. 6 (1950). As a result, it is simply not true that Sav-On was forced to discharge Kunysz and Fogel in order to

avoid unfair labor practice charges. Whether Sav-On was subjected to some form of duress—either legal, as Sav-On itself contends, or economic and administrative, as the majority asserts—which compelled bargaining with the Union is therefore simply irrelevant to the Board's conclusion, supported by substantial evidence in the record, that Sav-On discharged Kunysz and Fogel in violation of the Act.

Sav-On and the Union's negotiations are of even less discernible relevancy to whether termination of the striking pharmacists constituted an unfair labor practice. The majority seems to have ignored this issue entirely. Strikers retain their status as "employees" under section 2(3) of the Act and therefore have a right to be reinstated to their former positions at the conclusion of a strike.[2] *NLRB v. Fleetwood Trailer Co., Inc.,* 389 U.S. 375, 378, 88 S.Ct. 543, 545–546, 19 L.Ed.2d 614 (1967). An employer violates section 8(a)(3) and (1) of the Act if he discharges employees for engaging in a lawful strike, *NLRB v. International Van Lines,* 409 U.S. 48, 50–52, 93 S.Ct. 74, 76–77, 34 L.Ed.2d 201 (1972), and the Board has held, with the approval of this and other courts, that employees who are discharged because of strike activity are entitled·to backpay from the date of the unlawful discharge until the employer's liability for backpay is tolled by an offer of reinstatement. *NLRB v. Trident Seafoods Corp.,* 642 F.2d 1148, 1149–50 (9th Cir.1981); *NLRB v. Lyon & Ryan Ford, Inc.,* 647 F.2d 745, 755–57 (7th Cir.), *cert. denied,* 454 U.S. 894, 102 S.Ct. 391, 70 L.Ed.2d 209 (1981); *Abilities & Goodwill, Inc.,* 241 N.L.R.B. 27, 27, *enf. denied on other grounds,* 612 F.2d 6 (1st Cir.1979); *Fry Foods, Inc.,* 241 N.L.R.B. 76, 76 n. 2, *enf'd,* 609 F.2d 267 (6th Cir. 1979). Since Sav-On stipulates here that it

discharged the strikers because of their strike activity, it is plain that Sav-On has violated the Act and that the strikers are entitled to backpay from the date of their discharge.[3]

### III

Although the majority does not advert to it, Sav-On argued before this court that it had a right to discharge the strikers because the strike violated the no-strike clause in its collective bargaining agreement with the Union and was therefore unprotected. *See Mastro Plastics Corp. v. NLRB,* 350 U.S. 270, 280, 76 S.Ct. 349, 356, 100 L.Ed. 309 (1956); *Chrysler Corp., Dodge Truck Plant,* 232 N.L.R.B. 466, 474 (1977). However, this argument will not withstand scrutiny. In the first place, only about half of the strikers were covered by the contract, for thirty-one of those discharged were either from non-union stores or were pharmacist managers excluded from coverage by the parties' extension agreement.[4] Since these employees were not bound by the contract, their conduct in striking was within the Act's protection and Sav-On was not free to discharge them.

Furthermore, even those strikers who were covered by the contract did not strike in breach of the no-strike clause. It is well settled that a no-strike obligation is the *quid pro quo* for an employer's agreement to submit disputes to arbitration, *Boys Markets, Inc. v. Retail Clerks Union, Local 770,* 398 U.S. 235, 248, 90 S.Ct. 1583, 1591, 26 L.Ed.2d 199 (1970), and that, therefore, absent explicit agreement to the contrary, a no-strike obligation is limited to disputes over arbitrable issues. *Gateway Coal Co. v. United Mine Workers,* 414 U.S. 368, 382, 94 S.Ct. 629, 639, 38 L.Ed.2d 583 (1974); *NLRB v. Southern California Edison Co.,* 646 F.2d

---

**2.** Section 2(3) provides that the term "employee" shall include "any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute." 29 U.S.C. § 152(3) (1976).

**3.** The question whether reinstatement was offered and similar questions regarding the actual computation of the amounts of backpay owing would have been resolved in the compliance stage of the proceedings which would have

followed if the Board's order had been enforced. *See NLRB v. International Association of Bridge, Structural & Ornamental Iron Workers, Local 433,* 600 F.2d 770, 778–79 (9th Cir. 1979), *cert. denied,* 445 U.S. 915, 100 S.Ct. 1275, 63 L.Ed.2d 599 (1980).

**4.** The administrative law judge found that 16 discharged strikers were from non-union stores and 15 were classified as pharmacy managers.

1352, 1367 (9th Cir.1981). In this case, the administrative law judge found, with the Board's approval, that the no-strike clause limits the no-strike obligation to matters subject to the grievance-arbitration procedure. This interpretation, which is reasonable and consistent with the principles set out above, is entitled to deference from this court. *NLRB v. Southern California Edison Co.,* 646 F.2d at 1366–67. The dispute which gave rise to the strike, of course, was Sav-On's termination of pharmacist managers Kunysz and Fogel, and this dispute was not subject to arbitration because the parties' extension agreement, signed two months earlier, had excluded pharmacist managers from the contract's coverage. It follows that the no-strike clause did not limit the employees' right to strike in support of Kunysz and Fogel since the dispute surrounding their discharge could not have been resolved through arbitration. In response, Sav-On argues that the extension agreement between Sav-On and the Union did *not* in fact exclude the pharmacist managers, since it excluded only pharmacist managers "who are supervisors within the meaning of the Act" and the Board, some eight months later, determined that the pharmacist managers were not "supervisors within the meaning of the Act." Therefore, according to Sav-On, the Board was incorrect in concluding that the Kunysz and Fogel terminations were not subject to the contract arbitration procedure. This argument also must fail. With such an express indication that pharmacist managers were to be excluded from the agreement as appears from its language, the Board's conclusion that, at the time of the Kunysz and Fogel discharges, pharmacist managers were not covered by the contract is supported by substantial evidence. Since the strike did not violate the no-strike clause, it was within the Act's protection, and Sav-On violated section 8(a)(3) and (1) of the Act by discharging the strikers and refusing to reinstate them at the termination of the strike.

## IV

The majority holds today that the Act permits employees to be discharged for exercising protected rights if a rival union, here the Guild, either could have preserved the status quo pending Board review by obtaining a stay of the regional director's judgment, or in fact made demands which pressured the employer into actions which indirectly led to the Act's violation. Neither the statutory language nor history of the Act authorizes such treatment or analysis. The Guild's conduct or lack of it is simply not an element of an unfair labor practice within the meaning of section 8(a)(1). *See, e.g., Textile Workers Union v. Darlington Manufacturing Co.,* 380 U.S. 263, 269, 85 S.Ct. 994, 999, 13 L.Ed.2d 827 (1965); *Fun Striders, Inc. v. NLRB,* 686 F.2d 659, 662 (9th Cir.1981).

In sum, the majority opinion mystifies me. That Sav-On was caught in a "crossfire" between the Union and the Guild has apparently evoked the majority's sympathy, prompting the untenable conclusion that to enforce the board order would somehow be inequitable. I simply cannot fathom upon what legal principle the majority opinion is based. I will, however, hazard a prediction that, as a precedent in the field of labor law, the majority opinion will generate more smoke than light.